Michael A. Sirignano (MS 5263)
Barry I. Levy (BL 2190)
Priscilla Kam (PK 1505)
Joanna Rosenblatt (JR 3359)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees*
*Insurance Company, GEICO Indemnity Company,*
*GEICO General Insurance Company and*
*GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                         Plaintiffs,

           -against-

READY RX, LLC,
IGOR ARONOV, and
ALBERT PINKHASOV

                         Defendants.

Docket No.: _____(    )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## **COMPLAINT**

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively, "GEICO" or

"Plaintiffs"), as and for their Complaint against Defendants, Ready Rx, LLC, Igor Aronov, and

Albert Pinkhasov, (collectively, "Defendants"), hereby allege as follows:

1.      This action seeks to terminate an on-going fraudulent scheme perpetrated by the Defendants who have exploited the New York "No-Fault" insurance system by submitting more than $1.4 million in fraudulent pharmaceutical billing to GEICO.  Specifically, the Defendants submitted, or caused to be submitted, thousands of fraudulent charges to GEICO seeking payment for a set of specifically targeted medically unnecessary "pain relieving" topical prescription drug products, including topical pain gels, lotions. ointments, and patches (collectively, the "Fraudulent Topical Pain Products"), as well as various other medications primarily in the form of oral nonsteroidal anti-inflammatory drugs and muscle relaxers (together with the Fraudulent Topical Pain Products, the "Fraudulent Pharmaceuticals").

2.      Defendants Ready Rx, LLC ("Ready Rx") and its owners, Igor Aronov ("Aronov") and Albert Pinkhasov ("Pinkhasov"), dispensed the Fraudulent Pharmaceuticals to individuals involved in automobile accidents and eligible for insurance coverage under policies of insurance issued by GEICO (the "Insureds"). In order to exploit the Insureds for financial gain, the Defendants targeted the prescription and dispensing of the Fraudulent Topical Pain Products in place of other effective, but much-less costly prescription and non-prescriptions drug products because the Defendants were able to acquire the Fraudulent Topical Pain Products at low cost and then dispense and bill for them at exorbitant prices.

3.      As an essential part of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with various prescribing healthcare providers (the "Prescribing Providers") and persons who work at or are associated with various multidisciplinary medical clinics (the "Clinic Controllers"), that almost exclusively treat No-Fault patients, and steered them to direct large volumes of prescriptions to Ready Rx for the targeted Fraudulent Topical Pain Products, in exchange for kickbacks.

4.      The scheme spearheaded by the Defendants to steer the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Ready Rx for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements egregiously inflated the charges submitted to GEICO.  For example, Ready Rx typically billed between $918.00 to $1,527.00 for a single tube of Lidocaine 5% Ointment, and an average of $1,892.20 for a single tube of Diclofenac Gel 3%. Similarly, Ready Rx dispensed and billed for various topical pain patches, such as Lidothol 4.5-5% Patches at an average charge of $1,315.20 to $1,966.95 for each prescription, and Lidocaine 5% Patches at an average charge of $678.92 to $744.87 per prescription.

5.      By this action, GEICO seeks to recover more than $339,000.00 that Ready Rx and the other Defendants stole from it, along with a declaration that GEICO is not legally obligated to pay reimbursement to Ready Rx of over $970,000.00 in pending fraudulent No-Fault claims that the Defendants submitted or caused to be submitted through Ready Rx because:

> (i)      The Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Ready Rx in exchange for unlawful kickbacks and other financial incentives;
>
> (ii)     Ready Rx billed for pharmaceutical products that were prescribed and dispensed pursuant to illegal, collusive agreements, as well as predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;
>
> (iii)    the Defendants intentionally targeted a specific set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Ready Rx dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals; and
>
> (iv)     the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals under the name of Ready Rx pursuant to illegal, invalid, and duplicitous prescriptions.

6.   The Defendants fall into the following categories:

(i)   Ready Rx is a New York limited liability company engaged in a fraudulent scheme in which it dispensed the Fraudulent Pharmaceuticals, pursuant to illegal, collusive agreements and predetermined protocols, without regard to genuine patient care, in order to submit to GEICO and other New York automobile insurers claims for reimbursement of No-Fault benefits to which it is not entitled; and

(ii)   Aronov and Pinkhasov are the record owners and managing members of Ready Rx.  Aronov is also the supervising pharmacist of Ready Rx.

7.   The Defendants' scheme began in 2019 and continues uninterrupted to the present day.  As discussed more fully below, the Defendants at all times have known that: (i) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct medically unnecessary prescriptions for the Fraudulent Pharmaceuticals to Ready Rx in exchange for unlawful kickbacks and other financial incentives; (ii) the billed-for pharmaceutical products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and had Ready Rx dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals; and (iv) the Defendants made and continue to make false and fraudulent misrepresentations to GEICO by submitting or causing to be submitted charges for the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous prescriptions.

8.   Based on the foregoing, Ready Rx does not now have – and never had – any right to be compensated for the Fraudulent Pharmaceuticals allegedly dispensed to GEICO Insureds. The chart attached hereto as Exhibit "1" sets forth the fraudulent claims that have been identified to-date which the Defendants submitted, or caused to be submitted, to GEICO through the United

States mail. As a result of the Defendants' scheme, GEICO has incurred damages of approximately $339,000.00.

## THE PARTIES

**I.      Plaintiffs**

9.      Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

**II.     Defendants**

10.     Defendant Ready Rx is a New York limited liability company, formed on or about June 27, 2019, with its principal place of business at 95-16 Queens Boulevard, Rego Park, New York.

11.     Defendant Aronov resides in and is a citizen of New York. Aronov, along with Pinkhasov, is a co-owner of Ready Rx and one of its two members.

12.     Defendant Aronov became a licensed pharmacist in the State of New York on November 4, 1999 and currently serves as the supervising pharmacist of Ready Rx.

13.     Defendant Pinkhasov resides in and is a citizen of New York.  Pinkhasov, along with Aronov, is a co-owner of Ready Rx and one of its two members.

14.     Defendant Pinkhasov became a licensed pharmacist in the State of New York on January 7, 2003.

15.     Aronov and Pinkhasov are no strangers to No-Fault fraudulent schemes. Both were previously sued by GEICO for perpetrating a similar No-Fault fraud scheme in Gov't Employees Ins. Co. et al. v. Custom Rx Pharmacy, LLC et al., 1:20-cv-02622-CBA-SJB.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331, over the claims brought under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO") Act, because they arise under the laws of the United States.

18.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of New York's No-Fault Laws

20.     GEICO underwrites automobile insurance in the State of New York.

21.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101 et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65 et seq.)(collectively, referred to herein as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to the Insureds.

22.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

23.     An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services. Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary goods and medical services provided, using the claim form required by the New York State Department of Insurance (known as the "Verification of Treatment by Attending Physician or Other Provider of Health Service," or, more commonly, as an "NF-3").  In the alternative, healthcare providers sometimes submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

24.     Pursuant to New York's No-Fault Laws (11 N.Y.C.R.R. § 65-3.16(a)(12)), a healthcare provider is not eligible to receive No-Fault Benefits if it fails to meet any applicable New York state or local licensing requirement necessary to perform such services in New York.

25.     The implementing regulation adopted by the Superintendent of Insurance, 11 NYCRR § 65-3.16(a)(12), provides, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … (emphasis supplied).

26.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

27.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.   An Overview of Applicable Licensing Laws

28.    Pursuant to New York Education Law § 6808, no person, firm, corporation or association shall possess drugs, prescriptions or poisons for the purpose of compounding, dispensing, retailing, wholesaling or manufacturing, or shall offer drugs, prescriptions or poisons for sale at retail or wholesale unless registered by the New York State Department of Education as a pharmacy, wholesaler, manufacturer or outsourcing facility.

29.    Pursuant to 8 N.Y.C.R.R. § 29.1 pharmacies in New York are prohibited from "exercising undue influence on the patient or client, including the promotion of the sale of services, goods, appliances or drugs in such manner as to exploit the patient or client for the financial gain of the practitioner or of a third party."

30.    Similarly, 8 N.Y.C.R.R. § 29.1 prohibits pharmacies from "directly or indirectly offering, giving, soliciting, or receiving or agreeing to receive, any fee or other consideration to or from a third party for the referral of a patient or client or in connection with the performance of professional services."

31.    Pursuant to 8 N.Y.C.R.R. § 63.1(7) pharmacists or pharmacy interns shall conduct a prospective drug review before each prescription is dispensed, which review shall include screening for potential drug therapy problems due to contraindications for use, therapeutic duplication, drug-drug interactions, including serious interactions with over-the-counter drugs, incorrect drug dosage or duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

32.     New York Education Law § 6810 prohibits pharmacies from dispensing when a prescription form for a drug includes any other drug.  Separate prescriptions are required for each drug prescribed and dispensed.

33.     New York Education Law § 6810 prohibits persons and corporations, not licensed to issue a prescription, to willfully cause prescription forms, blanks, or facsimiles thereof to be disseminated to any person other than a person who is licensed to issue a prescription.

34.     Pursuant to New York Education Law § 6808, pharmacy owners and supervising pharmacists shall be responsible for the proper conduct of a pharmacy.

35.     New York Education Law § 6530(17) prohibits a physician from "exercising undue influence" on the patient by promoting the sale of drugs so as to exploit the patient for the financial gain of the licensee or of a third party.

36.     New York Education Law § 6530(18) prohibits a physician from "directly or indirectly" offering, giving, soliciting, receiving or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

37.     New York Education Law § 6509-a, prohibits a professional licensee from "directly or indirectly" requesting, receiving, or participating in the division, transference, assignment, rebate, splitting, or refunding of a fee in connection with professional care or services including services related to drugs and/or medications.

III.    **The Defendants' Scheme Involving the Fraudulent Pharmaceuticals**

A.      **Overview of the Scheme**

38.     Beginning in 2019, and continuing uninterrupted through the present day, the Defendants masterminded and implemented a fraudulent scheme in which they used Ready Rx to exploit patients for financial gain by billing the New York automobile insurance industry for

hundreds of thousands of dollars in exorbitant charges relating to the Fraudulent Pharmaceuticals purportedly provided to the Insureds.

39.     Ready Rx purports to be a storefront neighborhood pharmacy operating in the Rego Park neighborhood of Queens County, New York but instead operates as part of a large-scale fraud scheme that exploited GEICO's Insureds, as well as insureds of other New York automobile insurers, through the prescribing and dispensing of the Fraudulent Pharmaceuticals, while intentionally ignoring a vast array of prescription and over-the-counter ("OTC") medications readily available at a fraction of the cost.

40.     Despite purporting to be storefront neighborhood pharmacy, Ready Rx utilized the same PO Box as seventeen other pharmacies and the same postal meter as eighteen other pharmacies, including three pharmacies connected to Peter Khaim and/or his brother Arkadiy Khaimov, who are alleged to secretly own and control multiple pharmacies that they used to submit approximately $6.9 million in fraudulent pharmaceutical claims to Medicare and Medicaid. See U.S.A. v. Khaim, et al., 1:20-cr-00580(AMD)(RML) (E.D.N.Y.) (the "Khaim Indictment").

41.     Unlike legitimate pharmacies dispensing a wide variety of pharmaceutical products, Ready Rx's business is largely focused on a limited set of pharmaceutical products (i.e., the Fraudulent Topical Pain Products).

42.     The Fraudulent Topical Pain Products were designed to exploit the Insureds for financial gain, as they are typically prescribed based on generic, preprinted, and boilerplate examination reports that are designed to justify continuing, voluminous, and excessive healthcare services.  Further, the Fraudulent Topical Pain Products themselves often have no proven efficacy and were often duplicative of other medications contemporaneously prescribed and dispensed to the Insureds.

43.     Nevertheless, the Defendants chose the Fraudulent Topical Pain Products because they knew that (i) similar over-the-counter drugs that could be recommended to Insureds are not covered expenses under the No-Fault Laws and (ii) they could acquire the Fraudulent Topical Pain Products at low cost and submit claims for reimbursement under the No-Fault Laws at exorbitant prices.

44.     More than 85% of the billing the Defendants submitted to GEICO through Ready Rx is for Fraudulent Topical Pain Products -- primarily consisting of topical lidocaine and topical diclofenac -- resulting in claims for reimbursement exceeding $893,700.00.

45.     It is worthwhile to note that the U.S. Department of Health & Human Services, Office of Inspector General ("OIG"), issued a report in August 2018 entitled, Questionable Billing For Compounded Topical Drugs in Medicare Part D, OEI-02-16-00440 (August 2018). This report noted that pharmacies with questionable billing primarily billed for compounded topical drugs containing lidocaine and diclofenac, and that the "OIG has previously raised concern about potential fraud and abuse related to both diclofenac and lidocaine."

46.     In furtherance of the fraudulent scheme, the Defendants entered into illegal, collusive agreements with the Prescribing Providers and the Clinic Controllers and steered them to prescribe and direct large volumes of prescriptions to Ready Rx for the targeted set of Fraudulent Topical Pain Products, purportedly to treat patients at various multidisciplinary medical clinics that almost exclusively treat No-Fault patients (the "No-Fault Clinics").

47.     Specifically, the Defendants paid unlawful kickbacks or provided other incentives to the Prescribing Providers and Clinic Controllers and, in exchange, the Prescribing Providers and Clinic Controllers prescribed or caused to be prescribed to Insureds specific prescription drugs with exorbitant profit margins (i.e., the Fraudulent Topical Pain Products) and routed those

prescriptions to the Defendants.  This permitted the Defendants to submit egregious claims for reimbursement for the Fraudulent Topical Pain Products to GEICO through Ready Rx.

48.     In other words, Ready Rx, in exchange for the payment of kickbacks, received medically unnecessary prescriptions from the Prescribing Providers and Clinic Controllers at the No-Fault Clinics pursuant to predetermined protocols.

49.     Notably, the No-Fault Clinics and the healthcare providers operating therefrom that directed prescriptions to Ready Rx have often been the subject of investigations and lawsuits commenced by various New York insurers with regard to their fraudulent billing and treatment practices, and have been the source of excessive, fraudulent treatment and billing schemes aimed at generating profits without regard to patient care.

50.     These No-Fault Clinics present themselves to be legitimate healthcare practices when, in fact, they are known No-Fault medical mills that house a "revolving door" of numerous healthcare providers who subject Insureds to as many healthcare goods and services as possible in order to exploit their No-Fault Benefits by submitting large volumes of fraudulent claims to No-Fault insurers such as GEICO.

51.     Similarly, GEICO has received billing from more than 80 different healthcare providers at 2386 Jerome Avenue, Bronx.

52.     Similarly, GEICO has received billing from more than 30 different providers at both 219 Hempstead Turnpike, West Hempstead and 941 Burke Avenue, Bronx.

53.     Each of the No-Fault Clinics has been the source of prescriptions that were routed to Ready Rx by the Prescribing Providers and Clinic Controllers operating therefrom and submitted by the Defendants in support of their fraudulent charges.

54.     Notably, a healthcare provider who operated from the No-Fault Clinic located at 550 Remsen Avenue, Brooklyn, attested to the fact that medical services billed to GEICO under the provider's name were never provided or authorized.

55.     In keeping with the fact that the Defendants illegally steered the Prescribing Providers and the Clinic Controllers at the No Fault Clinics to provide Ready Rx with prescriptions for the Fraudulent Pharmaceuticals pursuant to predetermined fraudulent protocols, Insureds were rarely given the option to use a pharmacy of their choosing.

56.     Instead, the Defendants colluded with the Prescribing Providers and Clinic Controllers to ensure that they directed the prescriptions for the Fraudulent Pharmaceuticals to Ready Rx, regardless of the distance of this pharmacy from the Insureds or the No-Fault Clinics where they were treating.

57.     In fact, less than 1% of Insureds who received prescriptions from Ready Rx resided in Rego Park – the Queens County neighborhood where Ready Rx is located, while less than one third of Insureds resided anywhere in Queens County.

58.     In most cases, Ready Rx either purported to deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes or the Fraudulent Pharmaceuticals were given to Insureds directly by the front desk staff at the various No-Fault Clinics.

59.     In many cases, the Insureds were not even aware that a Fraudulent Pharmaceutical dispensed by Ready Rx was prescribed to them until the medication was delivered to them or distributed to them by the front desk staff.

60.     As stated above, Aronov and Pinkhasov were previously sued by GEICO for perpetrating a similar No-Fault fraud scheme through another pharmacy they owned – Custom Rx

Pharmacy LLC ("Custom Rx").  See Gov't Employees Ins. Co. et al. v. Custom Rx Pharmacy, LLC et al., 1:20-cv-02622-CBA-SJB.

61.     Radha Gara, M.D. ("Dr. Gara") appeared for a nonparty deposition in Custom Rx and testified that multiple prescriptions submitted to GEICO by Aronov and Pinkhasov through Custom Rx were altered from his original prescription to include additional topical pain products that he did not authorize. Dr. Gara also identified several prescriptions on which his signature was forged and which were submitted to GEICO in support of Custom Rx's charges.

62.     Notwithstanding the submission of billing under different names and different tax identification numbers, Aronov and Pinkhasov operate Ready Rx in the same fraudulent manner they did Custom Rx and often operated the two pharmacies interchangeably.

63.     For example, (i) Pinkhasov is the supervising pharmacist for both Custom Rx and Aronov is the supervising pharmacist for Ready Rx; (ii) Ready Rx and Custom Rx submitted essentially the same forms in support of their billing submissions to GEICO; (iii) Custom Rx submitted billing to GEICO under Custom Rx's TIN with verification of treatment forms, delivery receipts, and other supporting documentation indicating the prescriptions were filled by Ready Rx; (iv) Ready Rx submitted a bill to GEICO indicating the prescription was faxed to Custom Rx but filled by Ready Rx; (v) Ready Rx and Custom Rx used the same postage meter to submit billing to GEICO and the same PO Box; and (vi)  Ready Rx and Custom Rx solicited prescriptions from many of the same Prescribing Providers and Clinic Controllers.

64.     At times Ready Rx and Custom Rx dispensed products to the same Insureds. Indeed, there are more than 125 GEICO Insureds treating at various No-Fault Clinics who were dispensed pharmaceutical products – often in excessive amounts – by both Custom Rx and Ready Rx.  For example,

i.    Insured GS was allegedly involved in a motor vehicle accident on October 27, 2019. On November 4, 2019 he sought treatment with 5 Borough Anesthesia, PLLC ("5 Borough") at a No-Fault Clinic located at 550 Remsen Avenue, Brooklyn, New York (the "Remsen Avenue Clinic") and underwent an examination with Nicole Hidalgo, P.A. ("Hidalgo") who prescribed Lidocaine 5% Ointment. On November 4, 2019 Custom Rx dispensed Lidocaine 5% Ointment to this Insured pursuant to the prescription from Hidalgo ordered on November 4, 2019. On December 3, 2019 Custom Rx dispensed Lidocaine 5% Ointment to this Insured pursuant to a prescription from Irfan David, N.P. ("David") ordered on December 2, 2019. On December 30, 2019 Custom Rx dispensed Acetaminophen and Lidocaine 5% Ointment to this Insured pursuant to a prescription from David ordered on December 30, 2019. On March 9, 2020 Custom Rx dispensed Acetaminophen and Lidocaine 5% Ointment to this Insured pursuant to prescriptions from David ordered on March 9, 2020. On July 7, 2020 Ready Rx dispensed Lidocaine 5% Ointment and Tylenol Arthritis Pain Reliever to this Insured pursuant to prescriptions from David ordered on July 6, 2020. On August 10, 2020 Ready Rx dispensed Lidocaine 5% Ointment and Tylenol Extra Strength to this Insured pursuant to prescriptions from David ordered on August 10, 2020. On November 3, 2020 Ready Rx dispensed Lidocaine 5% Ointment and Acetaminophen to this Insured pursuant to prescriptions from David ordered on November 2, 2020.

ii.   Insured NS was allegedly involved in a motor vehicle accident on November 1, 2019. On November 11, 2019 he sought treatment with 5 Borough at the Remsen Avenue Clinic and underwent an initial examination with David who prescribed Diclofenac Gel 3% and Nabumetone. On November 12, 2019 Custom Rx dispensed Diclofenac Gel 3% and Nabumetone to this Insured pursuant to prescriptions from David ordered on November 11, 2019. On December 30, 2019 Custom Rx dispensed Diclofenac Gel 3% and Nabumetone to this Insured pursuant to prescriptions from David ordered on December 30, 2019. On June 8, 2020 Ready Rx dispensed Diclofenac Gel 3% and Nabumetone to this Insured pursuant to a prescription from David ordered on June 8, 2020. On August 18, 2020 Ready Rx dispensed Diclofenac Gel 3% and Nabumetone to this Insured pursuant to a prescription from David ordered August 17, 2020.

iii.  Insured SS was allegedly involved in a motor vehicle accident on August 28, 2019. On September 5, 2019 she sought treatment with Danada Internal Medicine, P.C. ("Danada Internal Medicine") at a No-Fault Clinic located at 157-02 Northern Boulevard, Flushing, New York (the "Northern Boulevard Clinic") and underwent an examination with Jean Rhee, M.D. ("Dr. Rhee") who prescribed Lidothol Patches. On October 4, 2019 Custom Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to the prescription from Dr. Rhee ordered on September 28, 2019. On November 14, 2019 Custom Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on November 4, 2019. On December 19, 2019 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription

from Dr. Rhee ordered on December 10, 2019. On January 23, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on January 18, 2020. On March 4, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on March 2, 2020. On April 24, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on April 20, 2020. On May 21, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on May 18, 2020.

iv.     Insured NCP was allegedly involved in a motor vehicle accident on September 11, 2019. On September 30, 2019 he sought treatment with Danada Internal Medicine at Northern Boulevard Clinic and underwent an examination with Dr. Rhee who prescribed Lidothol Patches. On October 4, 2019 Custom Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to the prescription from Dr. Rhee ordered on September 30, 2019. On November 5, 2019 Custom Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on October 29, 2019. On December 9, 2019 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on November 27, 2019. On February 26, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches and Celecoxib to this Insured pursuant to a prescription from Dr. Rhee ordered on February 19, 2020. On April 24, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on April 20, 2020. On July 31, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on July 29, 2020.

v.      Insured LB was allegedly involved in a motor vehicle accident on August 28, 2019. On September 5, 2020 he sought treatment with Danada Internal Medicine at the Northern Boulevard Clinic and underwent an examination with Dr. Rhee. On September 28, 2020 he underwent a follow up medical examination with Dr. Rhee who prescribed Lidothol 4.5-5% Patches. On October 4, 2020 Custom Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to the prescription from Dr. Rhee ordered on September 28, 2019. On November 14, 2019 Custom Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on November 4, 2019. On December 19, 2019 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on December 10, 2019. On January 23, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on January 18, 2020. On March 4, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on March 2, 2020. On April 24, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on April 20, 2020. On May 21, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on May 18, 2020.

vi.    Insured RM was allegedly involved in a motor vehicle accident on January 4, 2020. On January 8, 2020 he sought treatment with Crystal Ray Medical, P.C. ("Crystal Ray Medical") at a No-Fault Clinic located at 96-14 63rd Drive, Suite 200, New York (the "63rd Drive Clinic") and underwent an examination with Igor Cohen, M.D. ("Dr. Cohen") who prescribed Lidocaine 5% Ointment (with four refills), Chlorzoxazone, and Mobic (with three refills). On January 9, 2020 Custom Rx dispensed Lidocaine 5% Ointment, Meloxicam (generic Mobic), and Chlorzoxazone to this Insured pursuant to the prescriptions from Dr. Cohen ordered on January 8, 2020. On February 7, 2020 Custom Rx dispensed a refill of Lidocaine 5% Ointment and Meloxicam to this Insured pursuant to the prescriptions from Dr. Cohen ordered on January 8, 2020. On March 5, 2020 Custom Rx dispensed a refill of Lidocaine 5% Ointment and Meloxicam to this Insured pursuant to the prescriptions from Dr. Cohen ordered on January 8, 2020. On April 15, 2020 Custom Rx dispensed a refill of Lidocaine 5% Ointment and Meloxicam to this Insured pursuant to the prescriptions from Dr. Cohen ordered on January 8, 2020. On May 12, 2020 Custom Rx dispensed a refill of Lidocaine 5% Ointment to this Insured pursuant to the prescription from Dr. Cohen ordered on January 8, 2020. On June 23, 2020 Ready Rx dispensed Diclofenac Gel 3% to this Insured pursuant to a prescription from Dr. Cohen ordered on June 22, 2020. On July 21, 2020 Ready Rx dispensed a refill of Diclofenac Gel 3% to this Insured pursuant to the prescription from Dr. Cohen ordered on June 22, 2020. On August 25, 2020 Ready Rx dispensed a refill of Diclofenac Gel 3% to this Insured pursuant to the prescription from Dr. Cohen ordered on June 22, 2020. On October 21, 2020 Ready Rx dispensed Meloxicam to this Insured pursuant to a prescription from Dr. Cohen ordered on October 21, 2020.

vii.    Insured FM was allegedly involved in a motor vehicle accident on January 21, 2020. On January 27, 2020 she sought treatment with Progressive Medical Care, P.C. ("Progressive Medical Care") at a No-Fault Clinic located at 219 Hempstead Turnpike, West Hempstead, New York (the "Hempstead Turnpike Clinic") and underwent an examination with Lynn Segerivas, N.P. ("Segerivas") and Allan Hausknecht, M.D. ("Dr. Hausknecht") who prescribed Diclofenac 1.5% Solution. On January 28, 2020 Custom Rx dispensed Diclofenac 1.5% Solution to this Insured pursuant to the prescription from Dr. Hausknecht ordered on January 28, 2020. On March 10, 2020 Custom Rx dispensed Diclofenac 1.5% Solution and Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Hausknecht ordered on March 10, 2020. On May 24, 2020 Custom Rx dispensed Diclofenac 1.5% Solution to this Insured pursuant to a prescription from Dr. Hausknecht ordered on May 22, 2020. On July 6, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches and Diclofenac 1.5% Solution to this Insured pursuant to a prescription from Dr. Hausknecht ordered on July 3, 2020. On August 28, 2020 Ready Rx dispensed Diclofenac 1.5% Solution to this Insured pursuant to a prescription from Dr. Hausknecht ordered on August 27, 2020.

viii. Insured SQ was allegedly involved in a motor vehicle accident on October 28, 2019. On November 11, 2019 she sought treatment with Progressive Medical Care at the Hempstead Turnpike Clinic and underwent an examination with Segerivas and Dr. Hausknecht who prescribed Cyclobenzaprine and Lidocaine 5% Ointment. On November 13, 2019 Custom Rx dispensed Cyclobenzaprine and Lidocaine 5% Ointment pursuant to the prescriptions from Dr. Hausknecht ordered on November 13, 2019. On March 18, 2020 Custom Rx dispensed Diclofenac 1.5% Solution to this Insured pursuant to a prescription from Dr. Hausknecht ordered on March 18, 2020. On May 12, 2020 Custom Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Hausknecht ordered on May 12, 2020. On July 7, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Hausknecht ordered on July 3, 2020. On August 6, 2020 Ready Rx dispensed Diclofenac 1.5% Solution to this Insured pursuant to a prescription from Dr. Hausknecht ordered on August 5, 2020.

ix. Insured CS was allegedly involved in a motor vehicle accident on February 1, 2020. On March 26, 2020 he sought treatment with Englington Medical, P.C. ("Englington Medical") at a No-Fault Clinic located at 9525 Jamaica Avenue, Woodhaven, New York (the "Jamaica Avenue Clinic") and underwent an examination with Dr. Cohen who prescribed Diclofenac Gel 3% and Cyclobenzaprine. The prescription for Diclofenac Gel 3% allowed for four refills and the prescription for Cyclobenzaprine allowed for three refills. On March 26, 2020 Custom Rx dispensed Diclofenac Gel 3% and Cyclobenzaprine pursuant to the prescriptions from Dr. Cohen ordered on March 26, 2020. On April 29, 2020 Custom Rx dispensed refills of Diclofenac Gel 3% and Cyclobenzaprine pursuant to the prescriptions from Dr. Cohen ordered on March 26, 2020. On May 28, 2020 Custom Rx dispensed refills of Diclofenac Gel 3% and Cyclobenzaprine pursuant to the prescriptions from Dr. Cohen ordered on March 26, 2020. On June 29, 2020 Ready Rx dispensed Diclofenac Gel 3% and Cyclobenzaprine to this Insured pursuant to a prescription from Dr. Cohen ordered June 26, 2020. The prescription allowed for four refills of the Diclofenac Gel 3% and three refills of the Cyclobenzaprine. On July 30, 2020 Ready Rx dispensed refills of Diclofenac Gel 3% and Cyclobenzaprine pursuant to the prescriptions from Dr. Cohen ordered on June 26, 2020. On August 31, 2020 Ready Rx dispensed refills of Diclofenac Gel 3% and Cyclobenzaprine pursuant to the prescriptions from Dr. Cohen ordered on June 26, 2020.

65. Both Custom Rx and Ready Rx have various connections to pharmacies that were identified as part of the Khaim Indictment, wherein brothers Peter Khaim and Arkadiy Khaimov are alleged to secretly own and control multiple pharmacies that submitted fraudulent billing to Medicare and Medicaid. Olga Iskhakova ("Iskhakova"), who filed the paperwork to register

Ready Rx with New York State Office of Professions, was responsible for filing the same paperwork on behalf of two pharmacies connected to the Khaim Indictment – Malvina Drugs, Inc. which was identified in the indictment, and Sterling Meds Rx, Inc. which is a reincarnate of another pharmacy identified in the indictment.

66.     Furthermore, both Ready Rx and Custom Rx utilized the same PO Box as seventeen other pharmacies and the same postal meter as eighteen other pharmacies.  These pharmacies include 21st Century Pharmacy, Inc. ("21st Century Pharmacy"), Rx For You Corp. ("Rx For You"), and Sutter Pharmacy Inc. d/b/a Rx For You ("Sutter Pharmacy") – all three of which are connected to Peter Khaim and/or his brother Arkadiy Khaimov.  Notably, 21st Century Pharmacy, Rx For You, Sutter Pharmacy, Peter Khaim, and Arkadiy Khaimov have been the subject of affirmative litigation commenced by various insurance carriers for perpetuating similar No-Fault schemes as Ready Rx.  See GEICO et al. v. 21st Century Pharmacy, Inc. et al., 1:16-cv-04826(ERK)(JO); Allstate Ins. Co. et al. v. 21st Century Pharmacy, Inc. et al., 1:17-cv-03731(WFK)(SMG); State Farm Mutual Automobile Ins. Co. v. 21st Century Pharmacy, Inc. et al., 1:17-cv-05845(MKB)(VMS); Allstate Ins. Co. et al. v. Hollis Novel Comprehensive Medical, P.C., 1:20-cv-06108(ENV)(RER); Government Employees Insurance Company et al. v. Chumaceiro et al., 1:20-cv-02220(DG)(PK); and Government Employees Insurance Company et al. v. Starrett City Medical, P.C. et al., 1:21-cv-00059(NGG)(RML).

67.     The Defendants spearheaded their pharmaceutical fraud scheme with Ready Rx knowing that (i) the Fraudulent Pharmaceuticals were the product of illegal, collusive arrangements intended to inflate the billing from Ready Rx to insurers and financially enrich the Defendants; (ii) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined protocols designed to exploit the patients for financial gain, without regard to

genuine patient care; (iii) the Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and dispensed in large volumes to Insureds at inflated charges; and (iv) the Fraudulent Pharmaceuticals were prescribed and dispensed without regard for the availability of a wide range of other prescription and over-the-counter medications proven to have therapeutic effects and available at a fraction of the cost.

### B.    The Fraudulent Pharmaceuticals Were Prescribed and Dispensed Without Regard to Genuine Patient Care In Order to Exploit Patients for Financial Gain

68.    In basic terms, the goal of medical treatment is to help patients get better in a timely manner. Notwithstanding this basic goal, the Insureds treated by the Prescribing Providers who prescribed pharmaceuticals dispensed by Ready Rx were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

69.    Evidence-based best practice guidelines for the treatment of acute and chronic pain do exist and should always guide prescribing habits. For example, the World Health Organization ("WHO") pain relief ladder recommends a non-opioid such as acetaminophen or a non-steroidal anti-inflammatory drug ("NSAID") for the initial management of pain. NSAIDs are the most commonly prescribed analgesic medications worldwide, and their efficacy for treating acute pain has been well demonstrated. If pain relief is not achieved, and doses are maximized, then an adjuvant oral agent may be added to the medication regimen – including the use of muscle relaxers and medications that block neuropathic pain transmission. Finally, opiates may be prescribed for short-term, limited use.

70.    More recently, in 2019 the Department of Health & Human Services ("DHHS") issued a Pain Management Best Practices Inter-Agency Task Force Report which focused on pain

management and the treatment of acute and chronic pain.  According to the DHHS report, such pain should be treated using an individualized, multimodal approach which may include prescription medications depending on various biological, psychological, and social factors of an individual patient, including, but not limited to, a patient's age, medical history, pain tolerance, genetics and neurological factors, stress level, coping ability, social support, and even education and cultural factors. A risk-benefit analysis should be applied to each patient prior to determining whether a medication is clinically appropriate.  Like the WHO pain relief ladder, the DHHS report indicates that non-opioids (e.g., NSAIDs) should be used as first line therapy for patients for whom these medications are clinically appropriate.

71.     Notably, for a drug to alleviate pain it must reach nerve or tissue receptors responsible for producing or transmitting a person's sensation of pain.

72.     Oral pain relievers reduce or alleviate pain by entering the bloodstream through the gastrointestinal system and traveling to the relevant nerve or tissue receptors. Some of the limited circumstances in which a physician would prescribe a topical medication include patients in whom these oral medications are contraindicated. For example, patients with moderate to severe kidney or liver dysfunction, or those with comorbidities that preclude the use of oral NSAIDs (e.g., history of peptic ulcer disease, coronary artery disease, or congestive heart failure).

73.     Despite these guidelines and the basic goal of helping patients get better in a timely fashion, the Insureds who received pharmaceuticals from Ready Rx, and who were treated by the Prescribing Providers at the No-Fault Clinics associated with the Clinic Controllers, were virtually always subjected to a predetermined and unnecessarily prolonged treatment protocol, which completely lacked in individualized care and failed to utilize evidence-based medical practices with the goal of the Insureds' timely return to good health.

74.     As part of the predetermined protocol, the Prescribing Providers produced generic, preprinted, and boilerplate examination reports designed to justify continued, voluminous and excessive healthcare services that the providers at the No-Fault Clinics purported to render to the Insureds. These healthcare services included the prescription of excessive and medically unnecessary pharmaceutical drug products, primarily in the form of exorbitantly priced topical pain products, including Diclofenac Gel 3%, Lidocaine 5% Ointment, Lidocaine 5% Patches, and Lidothol Patches.

75.     To the extent any examination was performed, the Prescribing Providers at times failed to document a detailed medical history of the patients to whom they prescribed the Fraudulent Pharmaceuticals.  In the event a medical history was documented, such history was not considered and had no influence on the Prescribing Provider's recommended treatment plan for the patient including whether to prescribe Fraudulent Pharmaceuticals.

76.     Prescribing a multitude of pharmaceutical drug products without first taking a detailed patient history, or without considering such history, demonstrates a gross indifference to patient health and safety as the Prescribing Providers often did not know, or care, whether the patient was currently taking any medication or suffering from any comorbidity that would contraindicate the use of a particular prescribed drug.

77.     The Prescribing Providers also did not document in their examination reports whether the patients were intolerant of oral medications or whether oral medications were otherwise contraindicated thereby necessitating a prescription for a Fraudulent Topical Pain Product dispensed by Ready Rx.

78.     The Prescribing Providers did not document in their examination reports any reason why the Fraudulent Topical Pain Products prescribed were medically necessary.

79. The Prescribing Providers also often failed to document in their follow-up examination reports whether the Fraudulent Topical Pain Products prescribed to a particular patient were used by the patient.

80. The Prescribing Providers also often failed to document in their follow-up examination reports whether the Fraudulent Topical Pain Products provided any pain relief to the patient or were otherwise effective for the purpose prescribed.

81. Notwithstanding the creation of the examination reports, the Prescribing Providers' prescriptions of the Fraudulent Pharmaceuticals that were dispensed by Ready Rx were based on predetermined protocols designed to exploit the Insureds for financial gain, without regard to the genuine needs of the patients.

82. In keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to fraudulent treatment protocols and collusive agreements, at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider.

83. An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact will all affect whether, how, and to what extent an individual is injured in a given automobile accident.

84. It is extremely improbable – to the point of impossibility – that multiple Insureds involved in the same automobile accident who were treated by the same Prescribing Provider would routinely require the same pharmaceutical products.

85. Even so, and in keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed pursuant to predetermined protocols to maximize profits,

at times two or more Insureds involved in the same minor motor vehicle accident received prescriptions for the same set of Fraudulent Pharmaceuticals at the time of their initial examinations with a Prescribing Provider.

86. For example,

i. On August 13, 2020, two Insureds – DB and ND – were involved in the same automobile accident. Thereafter, DB and ND both received treatment with Comprehensive Spine & Pain Center of New York, P.C. ("Comprehensive Spine") at a No-Fault Clinic located at 125 North Central Avenue, Valley Stream, New York (the "North Central Ave Clinic") with Timothy Canty, M.D. ("Dr. Canty.") DB and ND were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Ready Rx, after their initial examinations DB and ND were both issued prescriptions from Dr. Canty for Lidocaine 5% Ointment which was dispensed and billed by Ready Rx.

ii. On November 6, 2019, two Insureds –AC and MTR – were involved in the same automobile accident. Thereafter, AC and MTR both received treatment at Danada Internal Medicine at the Northern Boulevard Clinic with Dr. Rhee. AC and MTR were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent treatment protocols and collusive agreements with Ready Rx, after their initial examinations AC and MTR were both issued prescriptions from Dr. Rhee for Lidothol 4.5-5% Patches which were dispensed and billed for by Ready Rx.

iii. On June 13, 2020, three Insureds – EW, TW and TW – were involved in the same automobile accident. Thereafter, EW, TW, and TW all received treatment at Progressive Medical Care at the Hempstead Turnpike Clinic with Segerivas and Dr. Hausknecht. EW, TW, and TW were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent protocols and collusive agreements with Ready Rx, after their initial examinations EW, TW, and TW were all issued prescriptions from Dr. Hausknecht for Lidocaine 5% Ointment and Cyclobenzaprine which were dispensed and billed for by Ready Rx.

iv. On March 30, 2020, two Insureds –MB and YB– were involved in the same automobile accident. Thereafter, MB and YB both received treatment at Crystal Ray Medical at the 63rd Drive Clinic with Dr. Cohen. MB and YB were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to predetermined fraudulent protocols and collusive agreements with Ready Rx, after their initial examinations MB and YB were both issued prescriptions from Dr. Cohen for Lidocaine 5% Patches,

Ibuprofen, and Cyclobenzaprine which were dispensed and billed for by Ready Rx.

v.   On April 16, 2020, two Insureds –HG and SC– were involved in the same automobile accident. Thereafter, HG and SC both received treatment at Conrad F. Cean, PLLC (the "Cean Practice") at the Remsen Avenue Clinic with David. HG and SC were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocols and collusive agreements with Ready Rx, after their initial examinations HG and SC were both issued prescriptions from David for Diclofenac Gel 3% and Nabumetone which were dispensed and billed for by Ready Rx.

vi.   On July 3, 2020, two Insureds –GL and GB– were involved in the same automobile accident. Thereafter, GL and GB both received treatment at Adaptation Medical, P.C. ("Adaptation Medical") at 1534 Broadway, Brooklyn, New York (the "Broadway Clinic") with Vladimir Onefater, M.D. ("Dr. Onefater"). GL and GB were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol and collusive agreements with Ready Rx, after their initial examinations GL and GB were both issued prescriptions from Dr. Onefater for Baclofen and Celecoxib which were dispensed and billed for by Ready Rx.

vii.   On April 24, 2020, two Insureds –FL and SJ– were involved in the same automobile accident. Thereafter, FL and SJ both received treatment at SH Medical, P.C. ("SH Medical") at 3960 Flatlands Avenue, Brooklyn, New York (the "Flatlands Avenue Clinic") with Yura Stoly, M.D. ("Dr. Stoly"). FL and SJ were in different physical conditions and experienced the impact from different positions in the vehicle. Even so, pursuant to the predetermined fraudulent protocol and collusive agreements with Ready Rx, after their initial examinations FL and SJ were both issued prescriptions from Dr. Stoly for Baclofen and Celebrex which were dispensed and billed for by Ready Rx.

87.    In keeping with the fact that the Fraudulent Pharmaceuticals were not medically necessary and were prescribed and dispensed pursuant to a fraudulent treatment protocol, the Defendants also provided certain Prescribing Providers with rubber stamps containing the names of the Fraudulent Pharmaceuticals. The Prescribing Providers then used the stamps on their official New York State prescription pads to prescribe the Fraudulent Pharmaceuticals to Insureds.

88.    The Defendants provided certain Prescribing Providers and Clinic Controllers with the prescription stamps to steer the Prescribing Providers and Clinic Controllers to prescribe, or

cause the prescription of, as many prescriptions as possible for the Fraudulent Pharmaceuticals, in exchange for kickbacks and other financial incentives.

89.     A representative sample of the prescriptions issued by the Prescribing Providers using rubber stamps, which Ready Rx submitted to GEICO in support of its fraudulent billing, is annexed hereto as Exhibit "2".

### i.     The Fraudulent Lidocaine Ointment and Diclofenac Gel Prescriptions

90.     In accordance with the fraudulent scheme discussed above, Ready Rx routinely billed GEICO for exorbitantly priced topical pain gels, ointments, and lotions including topical Lidocaine 5% Ointment ("Topical Lidocaine"), pursuant to prescriptions solicited from the Prescribing Providers and the Clinic Controllers in exchange for kickbacks or other financial incentives.

91.     The Defendants solicited the Prescribing Providers and the Clinic Controllers to provide them with voluminous prescriptions for Topical Lidocaine because the Defendants could readily buy Topical Lidocaine at low cost but bill GEICO and other New York No-Fault insurers through Ready Rx for huge sums based on egregiously high wholesale prices.

92.     Lidocaine is a local anesthetic (numbing medication) that works by blocking nerve signals in the top few millimeters of skin.  Lidocaine does not penetrate the skin enough to treat deep musculoskeletal pain.

93.     Excessive dosage or short intervals between doses of Lidocaine 5% Ointment can cause serious adverse effects including, among others, bradycardia, hypotension, and cardiovascular collapse that may lead to cardiac arrest. Accordingly, patients should be instructed to strictly adhere to the recommended dosage and a single application of Lidocaine 5% Ointment should not exceed 5 grams.

94.     Lidocaine 5% Ointment is primarily indicated for temporary pain relief associated with minor burns and skin irritations such as sunburn, insect bites, poison ivy, poison oak, poison sumac, abrasions of the skin and insect bites, or as a topical anesthetic for minor procedures such as sutures or injections.

95.     Despite this, the Prescribing Providers never recommended Insureds first use over-the-counter Lidocaine products to treat their minor aches and pains sustained in fender-bender type motor vehicle accidents.

96.     For example, the Prescribing Providers never recommended Insureds first try commonly available commercial products, such as Icy Hot Lidocaine or Aspercreme with Lidocaine, both of which contain 4% Lidocaine and are available at most well-known pharmacy retailers at a mere fraction of the cost, including Rite-Aid and Target for advertised prices in the range of approximately $6.99 and generally less than $10.00.

97.     Rather, pursuant to collusive arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Insureds Lidocaine 5% Ointment and directed the prescriptions to Ready Rx.

98.     In keeping with the fact that the Lidocaine 5% Ointment was prescribed and dispensed pursuant to collusive arrangements and predetermined protocols, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the Lidocaine 5% Ointment prescriptions. Likewise, the follow-up examination reports often failed to address whether the Lidocaine 5% Ointment prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

99.     Indeed, Lidocaine 5% Ointment was routinely prescribed at the time of the initial examination during the acute stages of the Insureds' pain symptoms before Insureds even had an opportunity to first try readily available, low-cost, over the counter Lidocaine products or oral pain medication, For example,

i.     On July 19, 2020 an Insured IU was allegedly involved in a motor vehicle accident. On July 20, 2020 IU underwent an initial examination at Crystal Ray Medical at the 63rd Drive Clinic with Dr. Cohen who prescribed Lidocaine 5% Ointment and Butalbital-APAP-Caffeine. On July 21, 2020 Ready Rx dispensed Lidocaine 5% Ointment and Butalbital-APAP-Caffeine to this Insured pursuant to the prescription from Dr. Cohen ordered on July 20, 2020, one day post-accident. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

ii.     On July 19, 2020 an Insured II was allegedly involved in a motor vehicle accident. On July 20, 2020 II underwent an initial examination at Crystal Ray Medical at the 63rd Drive Clinic with Dr. Cohen who prescribed Lidocaine 5% Ointment, Ibuprofen, and Cyclobenzaprine. On July 21, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Ibuprofen, and Cyclobenzaprine to this Insured pursuant to the prescription from Dr. Cohen ordered on July 20, 2020, one day post-accident.

iii.     On November 16, 2020 an Insured named IB was allegedly involved in a motor vehicle accident. On November 18, 2020 IB underwent an initial examination at Crystal Ray Medical at the 63rd Drive Clinic with Dr. Cohen who prescribed Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, Ibuprofen, and Chlorzoxazone. On November 18, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, Ibuprofen, and Chlorzoxazone to this Insured pursuant to the prescription from Dr. Cohen ordered on November 18, 2020, two days post-accident. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

iv.     On August 9, 2020 an Insured named JS was allegedly involved in a motor vehicle accident. On August 11, 2020 JS underwent an initial examination at Progressive Medical Care at the Hempstead Turnpike Clinic with Segerivas and Dr. Hausknecht who prescribed Lidocaine 5% Ointment and Flexeril (cyclobenzaprine). On August 17, 2020 Ready Rx dispensed Cyclobenzaprine and Lidocaine 5% Ointment to this Insured pursuant to a prescription from Dr. Hausknecht ordered on August 14, 2020, five days post-accident.

v.      On August 9, 2020 an Insured named TD was allegedly involved in a motor vehicle accident. On August 11, 2020 TD underwent an initial examination at Progressive Medical Care at the Hempstead Turnpike Clinic with Segerivas and Dr. Hausknecht who prescribed Lidocaine 5% Ointment. On August 17, 2020 Ready Rx dispensed Lidocaine 5% Ointment to this Insured pursuant to a prescription from Dr. Hausknecht ordered on August 14, 2020, five days post-accident.

vi.     On May 28, 2020 an Insured named JP was allegedly involved in a motor vehicle accident. On June 4, 2020 JP underwent an initial examination at Adaptation Medical at a No-Fault Clinic located at the Broadway Clinic with Dr. Onefater who prescribed Lidocaine 5% Ointment and Baclofen. On June 5, 2020 Ready Rx dispensed Lidocaine 5% Ointment and Baclofen to this Insured pursuant to the prescriptions from Dr. Onefater ordered on June 4, 2020, six days post-accident.

vii.    On August 17, 2020 Insured KK was allegedly involved in a motor vehicle accident. On August 24, 2020 KK underwent an initial examination at Crystal Ray Medical at the 63rd Drive Clinic with Dr. Cohen who prescribed Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, Cyclobenzaprine, and Ibuprofen. On August 25, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, Cyclobenzaprine, and Ibuprofen to this Insured pursuant to the prescriptions from Dr. Cohen ordered on August 24, 2020, seven days post-accident. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

viii.   On December 29, 2020 Insured BM was allegedly involved in a motor vehicle accident. On January 6, 2021 BM underwent an initial examination at Crystal Ray Medical at the 63rd Drive Clinic with Dr. Cohen who prescribed Lidocaine 5% Ointment, Celebrex, Chlorzoxazone, and Fioricet (Butalbital-APAP-Caffeine). On January 7, Ready Rx dispensed Lidocaine 5% Ointment, Celecoxib, Chlorzoxazone, and Butalbital-APAP-Caffeine to this Insured pursuant to the prescriptions from Dr. Cohen ordered on January 6, 2021, eight days post-accident. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

ix.     On April 15, 2020 an Insured named LS was allegedly involved in a motor vehicle accident. On April 29, 2020 LS underwent an initial examination at Metro Pain at a No-Fault Clinic located at 2386 Jerome Avenue, Bronx, New York (the "Jerome Avenue Clinic") with Dr. Paulus who prescribed Lidocaine 5% Ointment. On May 7, 2020 Ready Rx dispensed Lidocaine 5% Ointment to this Insured pursuant to a prescription from Dr. Paulus ordered on April 29, 2020, fourteen days post-accident.

x.   On August 13, 2020 an Insured named MC was allegedly involved in a motor vehicle accident. On August 31, 2020 MC underwent an initial examination at Progressive Medical Care at the Hempstead Turnpike Clinic with Segerivas and Dr. Hausknecht. On August 31, 2020 Ready Rx dispensed Lidocaine 5% Ointment to this Insured pursuant to the prescription from Dr. Hausknecht ordered on August 31, 2020, eighteen days post-accident.

100.   The Topical Lidocaine was prescribed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved, and OTC, medications proven to have therapeutic effects and available at a fraction of the cost.

101.   In keeping with the fact that Topical Lidocaine was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

102.   In further keeping with the fact that the Topical Lidocaine was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers often failed to address whether the Topical Lidocaine prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

103.   In keeping with the fact that the Defendants submitted bills pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, the Lidocaine 5% Ointment prescriptions were often issued contemporaneous to multiple other Fraudulent Pharmaceuticals such as oral NSAIDs and/or muscle relaxants. For example,

i.   Insured JC was allegedly involved in a motor vehicle accident on February 5, 2020. Thereafter JC sought treatment with Adaptation Medical at the Broadway Clinic.

On February 6, 2020 he underwent a medical examination at which Dr. Onefater prescribed Lidocaine 5% Ointment, Baclofen, and Celebrex. On February 6, 2020 Ready Rx dispensed Celecoxib, Lidocaine 5% Ointment, and Baclofen to this Insured pursuant to the prescription issued by Dr. Onefater on February 6, 2020, one day after the accident.

ii.    Insured VD was allegedly involved in a motor vehicle accident on September 7, 2020. Thereafter VD sought treatment with Crystal Ray Medical at the 63rd Drive Clinic. On September 16, 2020 he underwent a medical examination on at which Dr. Cohen prescribed Lidocaine 5% Ointment, Celebrex, and Flexeril. On September 17, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Cyclobenzaprine, and Celebrex to this Insured. Each of the prescriptions allowed for three refills.

iii.    Insured BC was allegedly involved in a motor vehicle accident on May 23, 2020. Thereafter BC sought treatment with Englinton Medical, P.C. ("Englinton Medical") at the Jamaica Avenue Clinic. On July 30, 2020 she underwent a medical examination at which Dr. Cohen prescribed Lidocaine 5% Ointment, Ibuprofen, and Cyclobenzaprine. On July 31, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Ibuprofen, and Cyclobenzaprine to this Insured. The prescriptions for Ibuprofen and Cyclobenzaprine each allowed for three refills. The prescription for Lidocaine 5% Ointment allowed for four refills. Thereafter she underwent an additional medical examination on October 8, 2020 at which Dr. Cohen prescribed Lidocaine 5% Ointment, Ibuprofen, and Cyclobenzaprine. On October 8, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Ibuprofen, and Cyclobenzaprine to this Insured. The Prescription for Lidocaine 5% Ointment allowed for two refills.

iv.    Insured SP was allegedly involved in a motor vehicle accident on December 4, 2019. Thereafter SP sought treatment with Conrad F. Cean, MD, PLLC (the "Cean Practice") at the Remsen Avenue Clinic. On May 18, 2020 she underwent a medical examination at which David prescribed Lidocaine 5% Ointment and Mobic (Meloxicam). Such a low dose is highly unlikely to have any therapeutic impact. On May 18, 2020 Ready Rx dispensed Lidocaine 5% Ointment and Meloxicam to this Insured. On July 27, 2020 Susan Pierre underwent a follow up medical examination at which David prescribed Lidocaine 5% Ointment and Mobic (Meloxicam). On July 28, 2020 Ready Rx dispensed Lidocaine 5% Ointment and Meloxicam to this Insured.

v.    Insured LIA was allegedly involved in a motor vehicle accident on October 18, 2020. Thereafter LIA sought treatment with Crystal Ray Medical at the 63rd Drive Clinic. On November 11, 2020 she underwent a medical examination at which Dr. Cohen prescribed Lidocaine 5% Ointment, Cyclobenzaprine, Ibuprofen, and Butalbital-APAP-Caffeine. On November 11, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Cyclobenzaprine, Ibuprofen, and Butalbital-APAP-Caffeine to this Insured. On December 9, 2020 she underwent a medical examination at which David prescribed Lidocaine 5% Ointment, Cyclobenzaprine, Ibuprofen, and Butalbital-APAP-Caffeine. On December 9, 2020 Ready Rx dispensed Lidocaine

5% Ointment, Cyclobenzaprine, Ibuprofen, and Butalbital-APAP-Caffeine to this Insured. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

vi.     Insured MA was allegedly involved in a motor vehicle accident on July 17, 2020. Thereafter MA sought treatment with Englinton Medical at the Jamaica Avenue Clinic. On September 24, 2020 he underwent a medical examination at which Dr. Cohen prescribed Lidocaine 5% Ointment, Ibuprofen, and Butalbital-APAP-Caffeine. On September 25, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Ibuprofen, and Butalbital-APAP-Caffeine to this Insured. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

vii.    Insured JT was allegedly involved in a motor vehicle accident on December 24, 2020. Thereafter JT sought treatment with Crystal Ray Medical at the 63rd Drive Clinic. On December 30, 2020 he underwent a medical examination at which Dr. Cohen prescribed Lidocaine 5% Ointment, Ibuprofen, and Chlorzoxazone. On December 30, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Ibuprofen, and Chlorzoxazone to this Insured.

viii.   Insured MB was allegedly involved in a motor vehicle accident on October 25, 2020. Thereafter MB sought treatment with Crystal Ray Medical at the 63rd Drive Clinic. On December 7, 2020 he underwent a medical examination at which Dr. Cohen prescribed Lidocaine 5% Ointment, Celebrex, and Chlorzoxazone. On December 8, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Celecoxib, and Chlorzoxazone to this Insured.

ix.     Insured IN was allegedly involved in a motor vehicle accident on July 18, 2020. Thereafter IN sought treatment with Progressive Medical Care at the Hempstead Turnpike Clinic. On August 4, 2020 he underwent an initial examination with Segerivas and Dr. Hausknecht. On August 6, 2020 Ready Rx dispensed Lidocaine 5% Ointment and Cyclobenzaprine to this Insured pursuant to a prescription from Dr. Hausknecht ordered on August 5, 2020.

x.      Insured SH was allegedly involved in a motor vehicle accident on January 15, 2020. Thereafter SH sought treatment with Crystal Ray Medical at the 63rd Drive Clinic. On February 12, 2020 she underwent a medical examination at which Dr. Cohen prescribed Lidocaine 5% Ointment, Chlorzoxazone, Ibuprofen, and Butalbital-APAP-Caffeine. On February 12, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Chlorzoxazone, Ibuprofen, and Butalbital-APAP-Caffeine to this Insured. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

104.    Ready Rx typically billed GEICO anywhere from $918.00 to $1,527.00 for a single tube of Lidocaine 5% Ointment and, to-date, has submitted over $447,000.00 in claims to GEICO seeking reimbursement of Lidocaine 5% Ointment.

105.    The Defendants' egregious billing coupled with the fact that the Prescribing Providers often failed to properly document the Insureds' use of these medications, further indicates that there was no legitimate medical reason for the Prescribing Providers to have prescribed large volumes of these medications to the Insureds, or for Ready Rx to have dispensed such large volumes to the Insureds, particularly given the potential for adverse health effects.

106.    In addition to the egregious number of Topical Lidocaine prescriptions dispensed by Ready Rx, in accordance with the fraudulent scheme discussed above, Ready Rx billed GEICO for exorbitantly priced topical Diclofenac Sodium Solution 1.5% ("Diclofenac Solution") and Diclofenac Sodium Gel 3% ("Diclofenac Gel") (together, "Topical Diclofenac"), pursuant to prescriptions solicited from Prescribing Providers and Clinic Controllers in exchange for kickbacks or other financial incentives.

107.    The Defendants solicited the Prescribing Practitioners and the Clinic Controllers to provide them with voluminous prescriptions for Topical Diclofenac because the Defendants could readily buy Topical Diclofenac at low cost but have Ready Rx bill GEICO and other New York No-Fault insurers huge sums based on egregiously high wholesale prices.

108.    Diclofenac Solutions in 1 to 1.5% concentration are topical NSAIDs approved by the United States Food and Drug Administration ("FDA") to treat joint pain caused by osteoarthritis in the hands, wrists, elbows, knees, ankles, or feet.

109.    Diclofenac Gel in 3% concentration is a topical NSAID approved by the FDA to treat a skin condition known as actinic keratoses.

110.    Topical Diclofenac does not have any proven efficacy or safety in the treatment of musculoskeletal injuries such as sprains or strains, nor is the use of Topical Diclofenac to treat musculoskeletal injuries an accepted "off-label" use.

111.    Moreover, some clinical studies of FDA-approved topical NSAIDs have shown them to be no more effective than placebo for treating acute pain (e.g., pain from strains, sprains, contusions, or overuse injuries) in superficial locations.

112.    The Prescribing Providers routinely prescribed and the Defendants routinely dispensed Diclofenac Solution despite the fact that virtually none of the Insureds suffered from osteoarthritis.

113.    The Prescribing Providers routinely prescribed and the Defendants routinely dispensed Diclofenac Gel despite the fact that none of the Insureds suffered from actinic keratoses.

114.    Moreover, the FDA requires that diclofenac sodium prescriptions contain a "Black Box Warning" due to the potential for serious cardiovascular and gastrointestinal risks.

115.    A "Black Box Warning" warning is the strictest warning attached to the labeling of a prescription drug or product by the FDA and is designed to call attention to serious or life-threatening risks associated with the drug or product.

116.    Specifically, with every diclofenac sodium prescription, the FDA requires the patient be warned that: (i) diclofenac sodium may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal; and (ii) diclofenac sodium may cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal.

117.    Notwithstanding the most common uses for Topical Diclofenac, or the risks associated with the drug, the Defendants steered the Prescribing Providers to prescribe Topical

Diclofenac, while oftentimes recommending the patient continue the use of oral NSAIDs, such as ibuprofen and naproxen, or simultaneously prescribing oral NSAIDs, muscle relaxers, and/or other Fraudulent Topical Pain Products such Lidocaine 5% Ointment and topical pain patches.

118.   Prescribing Topical Diclofenac, while simultaneously prescribing and dispensing oral NSAIDS to patients, is therapeutic duplication which can cause adverse events to the patient and very often leads to emergency room visits because the use of more than one medication in the same class of drugs exacerbates the possible adverse side effects.

119.   Each year in the United States, approximately 4.5 million ambulatory care visits and 100,000 deaths occur as a result of adverse drug reactions.  A substantial number of these adverse drug reactions are the result of improper prescription practices associated with therapeutic duplication.  See, Mathew Witry, PharmD, PhD, Medication List Discrepancies and Therapeutic Duplications Among Dual Use Veterans, Federal Practitioner, 14 (September 2016).

120.   Nevertheless, at times Prescribing Providers prescribed and the Defendants knowingly dispensed Topical Diclofenac in conjunction with oral NSAIDs and/or other Fraudulent Topical Pain Products to numerous Insureds, despite the risks it posed to the Insureds' health and well-being. For example,

i.    Insured DR was allegedly involved in a motor vehicle accident on May 24, 2019. Thereafter DR sought treatment with 5 Borough at a No-Fault Clinic located at 546 Howard Avenue, Brooklyn, New York (the "Howard Avenue Clinic"). She underwent a medical examination on March 10, 2020 at which David issued prescriptions for Diclofenac Gel 3%, Mobic (Meloxicam), and Lidocaine 5% Patches. On March 17, 2020 Ready Rx dispensed both a topical and an oral NSAID (i.e., Diclofenac Gel 3% and Meloxicam) to this Insured along with 30 Lidocaine 5% Patches. The simultaneous prescription of Meloxicam and Diclofenac Gel 3% constitutes therapeutic duplication and exposes the Insured to increased risk.

ii.   Insured GB was allegedly involved in a motor vehicle accident on November 15, 2019. Thereafter GB sought treatment with 5 Borough at the Howard Avenue Clinic. She underwent a medical examination on February 18, 2020 at which David issued prescriptions for Nabumetone and Diclofenac Gel 3%.  On

February 18, 2020 Ready Rx dispensed both a topical and an oral NSAID (i.e., Diclofenac Gel 3% and Nabumetone) to this Insured. The simultaneous prescription of Nabumetone and Diclofenac Gel 3% constitutes therapeutic duplication and exposes the Insured to increased risk. The Insured also has a history of hypertension placing her at a greater risk of cardiovascular events potentially caused by NSAIDs such as Diclofenac Gel 3%.

iii.    Insured BC was allegedly involved in a motor vehicle accident on November 26, 2019. Thereafter BC sought treatment with 5 Borough at the Howard Avenue Clinic. She underwent a medical examination on February 18, 2020 at which David issued prescriptions for Nabumetone, Cyclobenzaprine, and Diclofenac Gel 3%. On February 18, 2020 Ready Rx dispensed both a topical and an oral NSAID (i.e., Diclofenac Gel 3% and Nabumetone) and Cyclobenzaprine to this Insured. The simultaneous prescription of Nabumetone and Diclofenac Gel 3% constitutes therapeutic duplication and exposes the Insured to increased risk.

iv.    Insured LC was allegedly involved in a motor vehicle accident on December 30, 2019. Thereafter LC sought treatment with the Cean Practice located at the Remsen Avenue Clinic. He underwent a medical examination on July 27, 2020 at which David issued prescriptions for Mobic (Meloxicam) and Diclofenac Gel 3%. On August 28, 2020 Ready Rx dispensed both a topical and an oral NSAID (i.e., Diclofenac Gel 3% and Meloxicam) to this Insured. The simultaneous prescription of Meloxicam and Diclofenac Gel 3% constitutes therapeutic duplication and exposes the Insured to increased risk.

v.    Insured RF was allegedly involved in a motor vehicle accident on December 14, 2019. Thereafter RF sought treatment with the Cean Practice located at 941 Burke Avenue, Bronx, NY (the "Burke Avenue Clinic"). He underwent a medical examination on June 1, 2020 at which David issued prescriptions for Nabumetone and Diclofenac Gel 3%. On June 2, 2020 Ready Rx dispensed both a topical and an oral NSAID (i.e., Diclofenac Gel 3% and Nabumetone) to this Insured. RF underwent a follow up medical examination on July 13, 2020 at which David issued prescriptions for Diclofenac Gel 3% and Nabumetone. On July 14, 2020 Ready Rx again dispensed both a topical and an oral NSAID (i.e., Diclofenac Gel 3% and Nabumetone) to this Insured. RF underwent a follow-up medical examination on August 31, 2020 at which David again issued prescriptions for Nabumetone and Diclofenac Gel 3%. On August 31, 2020 Ready Rx again dispensed both the topical and an oral NSAID (i.e., Diclofenac Gel 3% and Nabumetone) to this Insured. The simultaneous prescription of Nabumetone and Diclofenac Gel 3% constitutes therapeutic duplication and exposes the Insured to increased risk.

vi.    Insured MS was allegedly involved in a motor vehicle accident on November 24, 2019. Thereafter MS sought treatment with 5 Borough located at the Remsen Avenue Clinic. He underwent a medical examination on February 24, 2020 at which David issued prescriptions for Nabumetone, Cyclobenzaprine,

and Diclofenac Gel 3%. On February 25, 2020 Ready Rx dispensed both a topical and an oral NSAID (i.e., Diclofenac Gel 3% and Nabumetone) as well as Cyclobenzaprine to this Insured. The simultaneous prescription of Nabumetone and Diclofenac Gel 3% constitutes therapeutic duplication and exposes the Insured to increased risk.

vii.   Insured IG was allegedly involved in a motor vehicle accident on August 11, 2020. Thereafter IG sought treatment with the Cean Practice at the Remsen Avenue Clinic. He underwent a medical examination on August 17, 2020 at which David issued prescriptions for Mobic (Meloxicam) and Diclofenac Gel 3%. On August 18, 2020 Ready Rx dispensed both a topical and an oral NSAID (i.e., Diclofenac Gel 3% and Meloxicam) to this Insured. The simultaneous prescription of Meloxicam and Diclofenac Gel 3% constitutes therapeutic duplication and exposes the Insured to increased risk.

viii.  Insured MJ was allegedly involved in a motor vehicle accident on December 10, 2019. Thereafter MJ sought treatment with the Cean Practice at the Remsen Avenue Clinic. He underwent a medical examination on June 22, 2020 at which David issued prescriptions for Mobic (Meloxicam) and Diclofenac Gel 3%. On June 23, 2020 Ready Rx dispensed a topical and an oral NSAID (i.e., Diclofenac Gel 3% and Meloxicam) to this Insured. The simultaneous prescription of Meloxicam and Diclofenac Gel 3% constitutes therapeutic duplication and exposes the Insured to increased risk.

ix.   Insured RS was allegedly involved in a motor vehicle accident on August 13, 2020. Thereafter RS sought treatment with BL Pain Management PLLC ("BL Pain") located at 1647 Macombs Road, Bronx, NY (the "Macombs Road Clinic"). He underwent a medical examination on September 10, 2020 with Boleslav Kosharskyy, M.D. ("Dr. Kosharskyy"). On September 10, 2020 Yahya Shah, P.A. ("Shah") issued prescriptions for Diclofenac Gel 1.5%, Baclofen, and Mobic (Meloxicam). On September 13, 2020 Ready Rx dispensed a topical and an oral NSAID (i.e., Diclofenac Gel 1.5% and Meloxicam) as well as Baclofen to this Insured. The simultaneous prescription of Diclofenac Gel 1.5% and Mobic (Meloxicam) constitutes therapeutic duplication and exposes the Insured to increased risk. Notably, this Insured is allergic to Ibuprofen, another NSAID.

x.   Insured DB was allegedly involved in a motor vehicle accident on January 21, 2020. Thereafter DB sought treatment with BL Pain at the Macombs Road Clinic. He underwent a medical examination on August 18, 2020 with Dr. Kosharskyy. On August 18, 2020 Shah issued prescriptions for Diclofenac Sodium 1.5% Transdermal Solution, Mobic (Meloxicam), and Baclofen. On August 19, 2020 Ready Rx dispensed a topical and an oral NSAID (i.e., Diclofenac Sodium 1.5% Transdermal Solution and Meloxicam) as well as Baclofen to this Insured. The simultaneous prescription of Diclofenac Sodium 1.5% Transdermal Solution and Mobic (Meloxicam) constitutes therapeutic duplication and exposes the Insured to increased risk.

121.    In the instant matter, by engaging in such therapeutic duplication, the Prescribing Providers and the Defendants put patients at increased risk of serious cardiovascular and gastrointestinal events (without any additional therapeutic benefit) as the use of oral NSAIDs increases the "Black Box Warning" risks associated with Topical Diclofenac.

122.    Moreover, the Prescribing Providers at times prescribed and the Defendants dispensed the Topical Pain Products contemporaneous to muscle relaxants such as Cyclobenzaprine.

123.    In accordance with best practices, a prescription for a seven-to-ten-day supply of Cyclobenzaprine may be appropriate during the *acute* stages of injury.  However, the Prescribing Providers often prescribed, and the Defendants dispensed, thirty-day supplies of Cyclobenzaprine and at times such prescriptions were issued well past the acute stages of injury.  For example,

    i.    Insured SS was allegedly involved in a motor vehicle accident on January 14, 2020. Thereafter SS sought treatment with 5 Borough at the Remsen Avenue Clinic. She underwent an initial examination on January 20, 2020. On July 27, 2020 David issued prescriptions for Lidocaine 5% Patches, Nabumetone, and a thirty-day prescription for Cyclobenzaprine over nine months post-accident. On July 28, 2020 Ready Rx dispensed for Lidocaine 5% Patches, Nabumetone, and Cyclobenzaprine to this Insured pursuant to the prescriptions from David dated July 27, 2020. Notably, SS's medical history includes surgery for a gastric bleed in September of 2019. SS's use of NSAID pain relievers, like Nabumetone, within one year of the surgery could increase her risk of a gastrointestinal bleed.

    ii.    Insured TB was allegedly involved in a motor vehicle accident on June 6, 2020. Thereafter TB sought treatment with the Cean Practice at the Remsen Avenue Clinic. She underwent an initial examination on June 22, 2020. On August 10, 2020, David issued prescriptions for Nabumetone and a thirty-day prescription of Cyclobenzaprine, approximately two months post-accident. On August 11, 2020 Ready Rx dispensed Nabumetone and a thirty-day prescription for Cyclobenzaprine to this Insured pursuant to the prescriptions from David dated August 10, 2020. On October 5, 2020 TB underwent a follow up examination at which David issued prescriptions for Nabumetone and a thirty-day prescription of Cyclobenzaprine approximately four months post-accident. On October 6, 2020 Ready Rx dispensed Nabumetone and Cyclobenzaprine to this Insured pursuant to the prescriptions from David dated October 5, 2020. On

November 9, 2020 David issued a prescription for Nabumetone, Lidocaine 5% Patches, and a thirty-day prescription for Cyclobenzaprine five months post-accident. On November 10, 2020 Ready Rx dispensed Nabumetone, Lidocaine 5% Patches, and Cyclobenzaprine to this Insured pursuant to the prescriptions from David dated November 9, 2020.

iii.   Insured EO was allegedly involved in a motor vehicle accident on January 14, 2020. Thereafter, EO sought treatment with Englinton Medical at the Jamaica Avenue Clinic. He underwent an initial examination with Arkaidy Shusterman, D.O. ("Dr. Shusterman") on January 27, 2020. On July 2, 2020, Dr. Cohen issued prescriptions for Meloxicam, Lidoderm 5% Patches, Butalbital-APAP-Caffeine, and a thirty-day prescription for Cyclobenzaprine nearly six months post-accident. The prescriptions for Meloxicam, Cyclobenzaprine, and Butalbital-APAP-Caffeine each allowed for three refills, and the prescription for Lidoderm 5% Patches allowed four refills. The prescription for Lidoderm 5% Patches instructed the EO to apply three patches per day, the maximum allowable daily dose, which increases EO's risk of overdose. On July 2, 2020 Ready Rx dispensed Meloxicam, Lidocaine 5% Patches, Cyclobenzaprine and Butalbital-APAP-Caffeine to this Insured pursuant to the prescriptions from Dr. Cohen dated July 2, 2020. On August 3, 2020 Ready Rx dispensed refills of Meloxicam, Lidocaine 5% Patches, Cyclobenzaprine, and Butalbital-APAP-Caffeine to this Insured. On September 21, 2020 Ready Rx dispensed refills of Meloxicam, Cyclobenzaprine, and Butalbital-Acetaminophen to this Insured. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

iv.   Insured BL was allegedly involved in a motor vehicle accident on February 23, 2020. Thereafter, BL sought treatment with Englinton Medical at the Jamaica Avenue Clinic. She underwent an initial examination with Dr. Shusterman on March 27, 2020. On June 26, 2020 Dr. Cohen issued prescriptions for Butalbital-APAP-Caffeine, Ibuprofen, Lidocaine 5% Ointment, and a thirty-day prescription for Cyclobenzaprine four months post-accident. The prescriptions for Butalbital-APAP-Caffeine, Ibuprofen, and Cyclobenzaprine each allowed for three refills, and the prescription for Lidoderm 5% Patches allowed four refills. On June 29, 2020 Ready Rx dispensed Butalbital-APAP-Caffeine, Ibuprofen, Lidocaine 5% Ointment, and Cyclobenzaprine to this Insured pursuant to prescriptions from Dr. Cohen ordered June 26, 2020. On July 28, 2020 Ready Rx dispensed refills of Butalbital-APAP-Caffeine, Ibuprofen, Lidocaine 5% Ointment, and Cyclobenzaprine to this Insured. On August 26, 2020 Ready Rx dispensed refills of Butalbital-APAP-Caffeine, Ibuprofen, Lidocaine 5% Ointment, and Cyclobenzaprine to this Insured. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

v.Insured VA was allegedly involved in a motor vehicle accident on November 30, 2019. Thereafter, VA sought treatment with Crystal Ray Medical at the 63rd

Drive Clinic. He underwent an initial examination with Dr. Cohen on December 9, 2020. On June 26, 2020 Dr. Cohen issued prescriptions for Meloxicam, Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, and a thirty-day prescription for Cyclobenzaprine nearly seven months post-accident. The prescriptions for Butalbital-APAP-Caffeine, Ibuprofen, Cyclobenzaprine, and Lidocaine 5% Ointment each allowed for three refills. On June 29, 2020 Ready Rx dispensed Meloxicam, Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Cohen ordered June 26, 2020. On July 30, 2020 Ready Rx dispensed a refill of Meloxicam, Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, and Cyclobenzaprine to this Insured. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

vi.   Insured BWH was allegedly involved in a motor vehicle accident on December 17, 2019. Thereafter BWH sought treatment with Englinton Medical at the Jamaica Avenue Clinic. She underwent an initial examination with Dr. Shusterman on December 20, 2019. On June 26, 2020 Dr. Cohen issued prescriptions for Meloxicam, Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, and a thirty-day prescription for Cyclobenzaprine with three refills six months post-accident. The prescriptions for Butalbital-APAP-Caffeine, Ibuprofen, and Cyclobenzaprine each allowed for three refills, and the prescription for Lidocaine 5% Ointment allowed four refills. On July 30, 2020 Ready Rx dispensed Meloxicam, Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Cohen ordered June 26, 2020. On August 31, 2020 Ready Rx dispensed refills of Meloxicam, Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, and Cyclobenzaprine. Notably, at her examination with Dr. Shusterman on December 20, 2019 BWH presented with a blood pressure of 170/110 which is a high-risk contraindication to her use of NSAID pain relievers like Cyclobenzaprine. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

vii.   Insured VAF was allegedly involved in a motor vehicle accident on February 15, 2020. Thereafter, VAF sought treatment with Englinton Medical at the Jamaica Avenue Clinic. She underwent an initial examination with Dr. Shusterman on February 24, 2020. On June 26, 2020 Dr. Cohen issued prescriptions for Meloxicam, Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, and a thirty-day prescription for Cyclobenzaprine over four months post-accident. The prescriptions for Butalbital-APAP-Caffeine, Ibuprofen, and Cyclobenzaprine each allowed for three refills, and the prescription for Lidocaine 5% Ointment allowed four refills. On June 29, 2020 Ready Rx dispensed Meloxicam, Lidocaine 5% Ointment, Butalbital-APAP-Caffeine, and Cyclobenzaprine to this Insured pursuant to the prescription from Dr. Cohen ordered June 26, 2020. Notably at her examination with Dr. Schusterman

on February 24, 2020 VAF presented with a blood pressure of 160-100, which is a high risk contra-indication to her use of NSAID pain relievers like Cyclobenzaprine. Additionally, the prescription of Butalbital-APAP-Caffeine is no longer within best practice guidelines due its addictive properties due to high caffeine content.

viii.  Insured DQ was allegedly involved in a motor vehicle accident on June 29, 2020. Thereafter, DQ sought treatment with Englinton Medical at the Jamaica Avenue Clinic. He underwent an initial examination with Dr. Shusterman on June 30, 2020. On August 20, 2020 Dr. Cohen issued prescriptions for Lidocaine 5% Ointment, Ibuprofen, and a thirty-day supply of Cyclobenzaprine nearly two months post-accident. The prescriptions for Ibuprofen and Cyclobenzaprine allowed for three refills, and the prescription for Lidocaine 5% Ointment allowed for four refills. On August 21, 2020 Ready Rx dispensed Lidocaine 5% Ointment, Ibuprofen, and Cyclobenzaprine to this Insured pursuant to the prescriptions from Dr. Cohen ordered August 20, 2020.

ix.  Insured CJ was allegedly involved in a motor vehicle accident on December 9, 2019. Thereafter CJ sought treatment with Metro Pain at the Macombs Road Clinic. She underwent an initial examination with Svetlana Trounina, M.D. ("Dr. Trounina") on December 17, 2019 at which she was diagnosed with shoulder and upper arm strain, thoracic ligament sprain, cervical ligament sprain, lumbar ligament sprain, and lumbosacral radiculopathy. On August 13, 2020 she underwent an initial examination with BL Pain with Dr. Kosharskyy. On August 13, 2020 Shah issued prescriptions for Diclofenac 1.5% Solution and a thirty-day supply of Cyclobenzaprine over eight months post-accident. On August 14, 2020 Ready Rx dispensed Diclofenac 1.5% Solution and Cyclobenzaprine to this Insured pursuant to the prescriptions from Shah ordered August 13, 2020.

x.  Insured VGG was allegedly involved in a motor vehicle accident on March 14, 2020. Thereafter VGG sought treatment with Metro Pain at the Macombs Road Clinic. He underwent an initial examination with Hong Pak, M.D. ("Dr. Pak") on March 17, 2020. On August 27, 2020 he underwent an initial examination with BL Pain Management with Dr. Kosharsky. On January 21, 2021 he underwent a follow up examination with BL Pain Management with Shah who issued prescriptions for Lidocaine 5% Ointment and a thirty-day supply of Cyclobenzaprine over ten months post-accident. On January 24, 2021 Ready Rx dispensed Lidocaine 5% Ointment and Cyclobenzaprine to this Insured pursuant to the prescriptions from Shah ordered on January 21, 2021.

124.  The Topical Diclofenac was prescribed and dispensed pursuant to collusive arrangements and predetermined treatment protocols, and without regard for patient care and safety, or the commercial availability of a wide range of FDA-approved medications, as well as

over-the-counter medications, proven to have therapeutic effects and available at a fraction of the cost.

125.     In keeping with the fact that Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care and safety, the initial examination reports prepared by the Prescribing Providers virtually never stated the medical basis for the prescriptions.

126.     In further keeping with the fact that the Topical Diclofenac was prescribed and dispensed pursuant to predetermined treatment protocols and without regard for patient care, the follow-up examination reports performed by the Prescribing Providers rarely addressed whether the Topical Diclofenac prescribed provided any pain relief to the patient or was otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

127.     Ready Rx's billing to GEICO for Topical Diclofenac exceeded $249,000.00.

128.     Specifically, most prescriptions for Topical Diclofenac were for Diclofenac Sodium Gel 3%.  Ready Rx typically billed GEICO $1,892.20 for a single tube and, to-date, billed GEICO over $180,000.00 for Diclofenac Sodium Gel 3%. Alternatively, the Prescribing Providers prescribed, and Ready Rx dispensed and billed for, Diclofenac Sodium Solution 1.5%.  Ready Rx typically billed GEICO $1,085.00 for a single tube and, to-date, billed GEICO over $68,000.00 for Diclofenac Sodium Solution 1.5%.

129.     In further keeping with the fact that the Defendants submitted bills pursuant to collusive arrangements with the Prescribing Providers and Clinic Controllers and pursuant to fraudulent, predetermined and profit-driven treatment protocols, at times Ready Rx dispensed multiple Topical Pain Products to the same Insured on the same date. For example,

   i.     Insured SS was allegedly involved in a motor vehicle accident on January 14, 2020. Thereafter she sought treatment with 5 Borough at the Remsen Avenue Clinic. On

September 25, 2020 Ready Rx dispensed a thirty-day supply of Lidocaine 5% Patches and Lidocaine 5% Ointment to this Insured pursuant to prescriptions from David ordered on September 21, 2020. On December 22, 2020 Ready Rx dispensed Nabumetone, a thirty-day supply of Cyclobenzaprine, Diclofenac 3% Gel, and a thirty-day supply of Lidocaine 5% Patches to this Insured pursuant to prescriptions from David ordered on December 21, 2020. On January 19, 2021 Ready Rx dispensed Nabumetone, a thirty-day supply of Cyclobenzaprine, Diclofenac 3% Gel, and a thirty-day supply of Lidocaine 5% Patches pursuant to prescriptions from David ordered on January 18, 2021.

ii.     Insured DR was allegedly involved in a motor vehicle accident on May 24, 2019. Thereafter she sought treatment with 5 Borough at the Howard Avenue Clinic. She underwent an examination on March 10, 2020 with David who prescribed Mobic, a thirty-day supply of Lidocaine 5% Patches, and Diclofenac 3% Gel. On March 17, 2020 Ready Rx dispensed Mobic, a thirty-day supply of Lidocaine 5% Patches, and Diclofenac 3% Gel to this Insured pursuant to the prescriptions from David.

iii.    Insured GD was allegedly involved in a motor vehicle accident on February 13, 2020. Thereafter he sought treatment with Progressive Medical Care at the Hempstead Turnpike Clinic. He underwent an examination on May 14, 2020 with Segerivas and Dr. Hausknecht. On July 3, 2020 Dr. Hausknecht prescribed a thirty-day supply of Lidothol 4.5-5% Patches, and Diclofenac 1.5% Solution. On July 6, 2020 Ready Rx dispensed a thirty-day supply of Lidothol 4.5-5% Patches and Diclofenac 1.5% Solution to this Insured pursuant to the prescriptions from Dr. Hausknecht.

iv.     Insured JP was allegedly involved in a motor vehicle accident on December 7, 2019. Thereafter he sought treatment with Progressive Medical Care at the Hempstead Turnpike Clinic. He underwent an examination on June 23, 2020 with Segerivas and Dr. Hausknecht. On July 3, 2020 Dr. Hausknecht prescribed a thirty-day supply of Lidothol 4.5-5% Patches and Diclofenac 1.5% Solution. On July 6, 2020 Ready Rx dispensed a thirty-day supply of Lidothol 4.5-5% Patches and Diclofenac 1.5% Solution to this Insured pursuant to the prescriptions from Dr. Hausknecht.

v.      Insured JB was allegedly involved in a motor vehicle accident on November 15, 2018. Thereafter he sought treatment with SMB Medical, PC ("SMB Medical") at a No-Fault Clinic located at 59-07 94th Street, Suite E8, Elmhurst, New York ("the 94th Street Clinic"). He underwent treatment on July 14, 2020 with Stephanie Bayner, M.D. ("Dr. Bayner") who prescribed Lidocaine 5% Patches, Diclofenac 3% Gel, and Fioricet. On July 14, 2020 Ready Rx dispensed Lidocaine 5% Patches, Diclofenac 3% Gel, and Butalbital-APAP-Caffeine to this Insured pursuant to the prescriptions from Dr. Bayner.

### ii. **The Fraudulent Pain Patch Prescriptions**

130.    As a further part of the scheme, Ready Rx routinely billed GEICO for exorbitantly priced pain patches – primarily in the form of Lidothol 4.5-5% Patches and Lidocaine 5% Patches (the "Topical Pain Patches"), pursuant to prescriptions solicited from the Prescribing Providers and the Clinic Controllers in exchange for kickbacks or other incentives.

131.    In keeping with the fact that the Defendants steered the Prescribing Providers to prescribe the Fraudulent Pharmaceuticals pursuant to predetermined protocols designed to maximize profits without regard for patient care, the Topical Patches were routinely dispensed and billed at exorbitant prices despite the availability of less expensive, commercially available FDA-approved patches.

132.    Despite the fact that the Prescribing Providers regularly prescribe Lidothol Patches, and the Defendants regularly dispense same, Lidothol Patches are not FDA approved.

133.    Further, Lidocaine Patches are primarily used to treat chronic post-herpetic neuropathic pain, although studies have shown that any relief these patches provide – beyond topical anesthetic relief – is more attributable to its placebo effect rather than the pharmacological action of the Lidocaine Patches themselves. In fact, while the application of pain patches in which the primary ingredient is Lidocaine provides sufficient absorption to cause an anesthetic effect, it is insufficient to produce a complete sensory block.

134.    Nevertheless, the Prescribing Providers routinely prescribed these patches to Insureds for sprain/strain injuries sustained in fender-bender type motor vehicle accidents.

135.    Like the prescriptions for Lidocaine 5% Ointment, the Prescribing Providers virtually never recommended Insureds first use over-the-counter Lidocaine products – which are available to treat their often acute, minor strain/sprain injuries. Rather, pursuant to collusive

arrangements and predetermined protocols, the Prescribing Providers routinely prescribed Insureds Lidocaine Patches.

136.     Indeed, the Topical Pain Patches were routinely prescribed at the time of the initial examination – during the acute stages of the Insureds' pain symptoms and before Insureds had an opportunity to try readily available OTC alternatives. For example,

    i.    On June 5, 2020 an Insured named KA was allegedly involved in a motor vehicle accident. On June 5, 2020 KA underwent an initial examination at Adaptation Medical at the Broadway Clinic with Dr. Onefater who prescribed Lidoderm Patches and Celebrex. On June 8, 2020 Ready Rx dispensed Lidocaine 5% Patches, and Celecoxib pursuant to a prescription from Dr. Onefater dated June 4, 2020, one day before the accident.

    ii.    On March 15, 2020 an Insured named SC was allegedly involved in a motor vehicle accident. On March 16, 2020 SC underwent an initial examination at Danada Internal Medicine at the Northern Boulevard Clinic with Dr. Rhee who prescribed Lidothol Patches. On March 24, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches pursuant to the prescription from Dr. Rhee dated March 16, 2020, one day post-accident.

    iii.    On November 1, 2020 an Insured named ID was allegedly involved in a motor vehicle accident. On November 3, 2020 ID underwent an initial evaluation at Danada Internal Medicine at the Northern Boulevard Clinic with Dr. Rhee who prescribed Lidothol Patches. On November 11, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches pursuant to the prescription from Dr. Rhee dated November 3, 2020, two days post-accident.

    iv.    On August 22, 2020 an Insured named ES was allegedly involved in a motor vehicle accident. On August 25, 2020 ES underwent an initial examination at Danada Internal Medicine at the Northern Boulevard Clinic with Dr. Rhee who prescribed Lidothol Patches. On September 10, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches pursuant to the prescription from Dr. Rhee dated August 25, 2020, three days post-accident.

    v.    On January 25, 2020 an Insured named KH was allegedly involved in a motor vehicle accident. On January 29, 2020 KH underwent an initial examination at Danada Internal Medicine at the Northern Boulevard Clinic with Dr. Rhee who prescribed Lidothol Patches. On February 5, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches pursuant to the prescription from Dr. Rhee dated January 29, 2020, four days post-accident.

    vi.    On August 5, 2020 an Insured named FN was allegedly involved in a motor vehicle accident. On August 11, 2020 FN underwent an initial examination at

Danada Internal Medicine at the Northern Boulevard Clinic with Dr. Rhee who prescribed Lidothol Patches. On August 13, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches pursuant to the prescription from Dr. Rhee ordered August 11, 2020, six days post-accident.

vii.    On December 31, 2020 an Insured named WP was allegedly involved in a motor vehicle accident. On January 7, 2021 WP underwent an initial examination at Adaptation Medical at the Broadway Clinic with Dr. Onefater who prescribed Lidoderm 5% Patches and Baclofen. On January 10, 2020 Ready Rx dispensed Lidocaine 5% Patches and Baclofen pursuant to the prescriptions from Dr. Onefater ordered January 7, 2021, seven days post-accident.

viii.   On September 7, 2020 an Insured named AG was allegedly involved in a motor vehicle accident. On September 16, 2020 AG underwent an initial examination at Crystal Ray Medical at the 63rd Drive Clinic with Dr. Cohen who prescribed Lidoderm 5% Patches and Ibuprofen. On September 16, 2020 Ready Rx dispensed Lidocaine 5% Patches and Ibuprofen pursuant to the prescription from Dr. Cohen dated September 16, 2020, nine days post-accident.

ix.     On June 22, 2020 an Insured named BI was allegedly involved in a motor vehicle accident. On July 1, 2020 BI underwent an initial examination at Crystal Ray Medical at the 63rd Drive Clinic with Dr. Cohen who prescribed Lidoderm 5% Patches, Flexeril, and Ibuprofen. On July 1, 2020 Ready Rx dispensed Lidocaine 5% Patches, Cyclobenzaprine, and Ibuprofen pursuant to a prescription from Dr. Cohen dated July 1, 2020, nine days post-accident.

x.      On July 12, 2020 an Insured named MB was allegedly involved in a motor vehicle accident. On July 20, 2020 MB underwent an initial examination at Crystal Ray Medical at the 63rd Drive Clinic with Dr. Cohen who prescribed Lidoderm 5% Patches, Celebrex, and Butalbital-APAP-Caffeine. On July 21, 2020 Ready Rx dispensed Lidoderm 5% Patches, Celebrex, and Butalbital-APAP-Caffeine pursuant to the prescriptions from Dr. Cohen dated July 20, 2020, nine days post-accident.

137.    As with the prescriptions for the other Fraudulent Topical Pain Products, the initial examination reports prepared by the Prescribing Providers virtually never set forth the medical basis for the prescriptions for the Topical Pain Patches. Likewise, the follow-up examination reports virtually never addressed whether the Topical Pain Patches prescribed provided any pain relief to the patient or were otherwise effective for the purpose prescribed, to what degree, or whether the patients experienced any side effects.

138.    In keeping with the fact that the Defendants acted with gross indifference to patient care and safety, upon information and belief the patients were generally not instructed on the safe use, side effects or risks associated with the Topical Pain Patches.

139.    To-date, Ready Rx has submitted to GEICO over $548,000.00 in claims seeking reimbursement for Topical Pain Patches.

140.    Ready Rx typically billed GEICO between $1,315.20 and $1,966.95 for each prescription of Lidothol 4.5-5% Patches and, to-date, billed GEICO over $498,000.00 for Lidothol 4.5-5% Patches. Ready Rx typically billed GEICO between $678.92 and $744.87 for each prescription of Lidocaine Patches they filled and, to-date, billed GEICO over $50,000.00 for Lidocaine Patches.

## C.    **The Exploiting of Patients for Financial Gain Through Illegal, Collusive Arrangements Among Ready Rx, the Prescribing Providers, and Clinic Controllers**

141.    To effectuate the fraudulent scheme, the Defendants steered the Prescribing Providers and Clinic Controllers to routinely prescribe and direct prescriptions to Ready Rx for large volumes of the Fraudulent Topical Pain Products pursuant to their collusive arrangements, which egregiously inflated the charges submitted to GEICO.

142.    New York's statutory framework provides, among other things, that pharmacies and licensed medical professionals are prohibited from (i) "exercising undue influence" on a patient by promoting the sale of drugs so as to exploit the patient for the financial gain, and (ii) "directly or indirectly" giving, soliciting, receiving, or agreeing to receive any fee or other consideration to or from a third party in connection with the performance of professional services.

143.    Here, the Defendants colluded with the Prescribing Providers and Clinic Controllers associated with various No-Fault Clinics, which treat thousands of Insureds, to have

the Prescribing Providers, prescribe, or purport to prescribe, the Fraudulent Pharmaceuticals, including the Fraudulent Topical Pain Products, and then to have those prescriptions directed to Ready Rx so that the Defendants could bill GEICO huge sums.

144.    In furtherance of the scheme, the Prescribing Providers intentionally prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics pursuant to the collusive arrangements and fraudulent predetermined protocols, and without regard to genuine patient care or safety, without regard to cost and attention to fiscal responsibility, and often without regard to pharmacologic outcomes.

145.    The Prescribing Providers prescribed, or purported to prescribe, the Fraudulent Pharmaceuticals to patients of the No-Fault Clinics, while the Defendants dispensed, or purported to dispense the Fraudulent Pharmaceuticals, despite their knowledge that the Fraudulent Pharmaceuticals were often prescribed and dispensed without regard to pharmacologic outcomes; the Fraudulent Pharmaceuticals were prescribed and dispensed with gross indifference to patient health, care and safety; the Fraudulent Topical Pain Products were prescribed and dispensed as a matter of course without any recommendation that patients first try over-the-counter products; and that the Fraudulent Pharmaceuticals were prescribed and dispensed without any attention to cost and fiscal responsibility, given that there are FDA-approved drugs available and appropriate for the particular patients at significantly less cost.

146.    The Defendants, in collusion with the Prescribing Providers and Clinic Controllers, made sure that the Insureds did not have the option to use a pharmacy of their choosing, and instead ensured that the prescriptions for the Fraudulent Pharmaceuticals were directed to Ready Rx, notwithstanding that (i) in many instances the No-Fault Clinics and the patients themselves were

located in counties far from Ready Rx in Rego Park, Queens and (ii) there were countless other pharmacies located much closer to the No-Fault Clinics and the patients.

147.    Ready Rx purported to mail or deliver the Fraudulent Pharmaceuticals directly to the Insureds' homes, often without the patient even knowing that they were to receive a Fraudulent Pharmaceutical.

148.    Alternatively, the Insureds were given the Fraudulent Pharmaceuticals dispensed by Ready Rx directly from the front desk staff at the various No-Fault Clinics, again without ever knowing that they were to receive a Fraudulent Pharmaceutical.

149.    The Defendants, the Prescribing Providers and the Clinic Controllers did not give the Insureds the option to identify a pharmacy of their choosing to ensure that the prescriptions were filled by Ready Rx, and to ensure that the Defendants benefitted financially from the prescriptions.

150.    The Prescribing Providers had no legitimate medical reason to prescribe the Fraudulent Pharmaceuticals in large quantities to their patients.

151.    The Prescribing Providers and the Clinic Controllers had no legitimate reason to direct the prescriptions for the Fraudulent Pharmaceuticals to Ready Rx rather than to a multitude of other pharmacies that were equally capable of dispensing the prescriptions and often more convenient to many of the patients.

152.    The Defendants, the Prescribing Providers and the Clinic Controllers would not have engaged in the illegal, collusive arrangements in violation of New York law, including intentionally prescribing the Fraudulent Pharmaceuticals and directing those prescriptions to Ready Rx, unless they profited from their participation in the illegal scheme.

153.    But for the payments of kickbacks or other financial incentives from the Defendants, the Prescribing Providers would not have prescribed the Fraudulent Topical Pain Products, or the volume of other Fraudulent Pharmaceuticals, and the Prescribing Providers and Clinic Controllers would not have directed the prescriptions to Ready Rx.

154.    The Defendants, Prescribing Providers, and Clinic Controllers affirmatively concealed the particular amounts paid for the kickbacks since such kickbacks are in violation of New York law.

155.    Nevertheless, based on the circumstances surrounding the illegal, collusive, arrangements, the Defendants paid a financial kickback or provided other financial incentives, and the Prescribing Providers and Clinic Controllers received a financial kickback or other financial incentives, for each of the particular prescriptions for the Fraudulent Pharmaceuticals that were dispensed by Ready Rx.

156.    Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued.

157.    In keeping with the Defendants' profit driven fraudulent scheme, as described above, the Prescribing Providers prescribed, and Ready Rx dispensed and billed for, excessively voluminous amounts of medically unnecessary Fraudulent Pharmaceuticals to Insureds solely to maximize profit. For example:

    i.    Insured JR was allegedly involved in a motor vehicle accident on December 19, 2019. Thereafter she sought treatment with Crystal Ray Medical at the 63rd Drive Clinic. On December 23, 2019 she underwent a medical examination at which Dr. Cohen prescribed Butalbital-APAP-Caffeine, Chlorzoxazone, Duexis, Lidocaine 5% Patches, and Tramadol. The prescriptions for Butalbital-APAP-Caffeine, Chlorzoxazone, and Lidocaine 5% Patches each allowed for three refills. The prescription for Duexis allowed for two refills. The prescription for Tramadol allowed for one refill. On December 23, 2020 Ready Rx dispensed Butalbital-APAP-Caffeine, Chlorzoxazone, Duexis, Lidocaine 5% Patches, and Tramadol to this Insured.

On January 21, 2020 Ready Rx dispensed to JR refills of Butalbital-APAP-Caffeine, Chlorzoxazone, Duexis, Lidocaine 5% Patches, and Tramadol. On January 22, 2020 Ready Rx dispensed to JR Dihydroergotamine pursuant to a prescription from Dr. Cohen ordered on January 22, 2020. The prescription allowed for four refills. On February 17, 2020 Ready Rx dispensed refills of Butalbital-APAP-Caffeine, Chlorzoxazone, Duexis, Lidocaine 5% Patches, and Dihydroergotamine. Notably, the simultaneous prescription of Dihydroergotamine and Butalbital-APAP-Caffeine constitutes duplication of therapy. On July 8, 2020 Ready Rx dispensed Butalbital-APAP-Caffeine, Chlorzoxazone, Duexis, and Lidocaine 5% Patches pursuant to prescriptions from Dr. Cohen ordered on July 8, 2020. The prescriptions for Lidoderm 5% Patches, Chlorzoxazone, and Butalbital-APAP-Caffeine allowed for three refills. The prescription for Duexis allowed for two refills. On August 7, 2020 Ready Rx dispensed refills of Butalbital-APAP-Caffeine, Lidocaine 5% Patches, and Chlorzoxazone. On September 8, 2020 Ready Rx dispensed refills of Butalbital-APAP-Caffeine and Chlorzoxazone to this Insured.

Ready Rx billed GEICO at least $17,132.61 for pharmaceuticals allegedly prescribed and dispensed to this Insured.

ii.     Insured RK was allegedly involved in a motor vehicle accident on March 2, 2020. Thereafter he sought treatment with Crystal Ray Medical at the 63rd Drive Clinic. On March 11, 2020 he underwent a medical examination at which Dr. Cohen prescribed Lidocaine 5% Ointment, Celebrex, Chlorzoxazone, and Butalbital-APAP-Caffeine. The prescriptions for Celebrex, Chlorzoxazone, and Butalbital-APAP-Caffeine each allowed for three refills. The prescription for Lidocaine 5% Ointment allowed for four refills. On March 11, 2020 Ready Rx dispensed to RK Lidocaine 5% Ointment, Chlorzoxazone, Celecoxib, and Butalbital-APAP-Caffeine pursuant to the prescriptions issued by Dr. Cohen on March 11, 2020. On April 13, 2020 Ready Rx dispensed refills of Lidocaine 5% Ointment, Celecoxib, Chlorzoxazone, and Butalbital-APAP-Caffeine to this Insured. On May 8, 2020 Ready Rx dispensed refills of Lidocaine 5% Ointment, Celecoxib, Chlorzoxazone, and Butalbital-APAP-Caffeine to this Insured. On July 9, 2020 Ready Rx dispensed a refill of Lidocaine 5% Ointment to this Insured. On August 5, 2020 RK underwent a follow up examination at which Dr. Cohen issued prescriptions for Celebrex, Chlorzoxazone, and Butalbital-APAP-Caffeine. The prescriptions all allowed three refills. On September 8, 2020 Ready Rx dispensed Celecoxib, Chlorzoxazone, and Butalbital-APAP-Caffeine to this Insured.

Ready Rx billed GEICO at least $13,652.07 for pharmaceuticals allegedly prescribed and dispensed to this Insured.

iii.    Insured CJ was allegedly involved in a motor vehicle accident on December 2, 2019. On December 20, 2019 he sought treatment with Englinton Medical

at the Jamaica Avenue Clinic and underwent an examination with Dr. Shusterman. Thereafter, on February 11, 2020 CJ underwent an examination with Dr. Cohen who prescribed Diclofenac Gel 3%, Chlorzoxazone, and Butalbital-APAP-Caffeine. The prescription for Diclofenac Gel 3% allowed for four refills. The prescriptions for Chlorzoxazone and Butalbital-APAP-Caffeine each allowed for three refills. On February 11, 2020 Ready Rx dispensed Diclofenac Gel 3%, Chlorzoxazone, and Butalbital-APAP-Caffeine to CJ pursuant to the prescriptions from Dr. Cohen ordered on February 11, 2020. On March 9, 2020 Ready Rx dispensed refills of Diclofenac Gel 3%, Chlorzoxazone, and Butalbital-APAP-Caffeine. On April 13, 2020 Ready Rx dispensed refills of Diclofenac Gel 3%, Chlorzoxazone, and Butalbital-APAP-Caffeine. On May 12, 2020 Ready Rx dispensed refills of Diclofenac Gel 3%, Chlorzoxazone, and Butalbital-APAP-Caffeine. Notably, CJ's medical history includes open heart surgery, which is a high-risk contraindication to CJ's use of NSAID pain relievers such as Diclofenac Gel 3%.

Ready Rx billed GEICO at least $12,694.08 for pharmaceuticals allegedly prescribed and dispensed to this Insured.

iv.    Insured NN was allegedly involved in a motor vehicle accident on February 10, 2020. On February 13, 2020 he sought treatment with Danada Internal Medicine at the Northern Boulevard Clinic and underwent an examination with Dr. Rhee who prescribed Lidothol Patches. On February 19, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to the prescription from Dr. Rhee. On April 3, 2020 Ready Rx dispensed Celecoxib and Lidothol 4.5-4% Patches to this Insured pursuant to prescriptions from Dr. Rhee dated March 31, 2020. On May 21, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on May 18, 2020. On June 30, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee dated June 24, 2020. On July 31, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee dated July 27, 2020. On September 10, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on September 1, 2020. On October 7, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on October 5, 2020. On December 23, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to this Insured pursuant to a prescription from Dr. Rhee ordered on December 15, 2020.

Ready Rx billed GEICO at least $10,911.83 for pharmaceuticals allegedly prescribed and dispensed to this Insured.

v.    Insured HC was allegedly involved in a motor vehicle accident on March 4, 2020. On March 9, 2020 he sought treatment with 5 Borough at a No-Fault

Clinic located at the Remsen Avenue Clinic and underwent an examination with David who prescribed Diclofenac Gel 3% and Mobic (Meloxicam). On March 17, 2020 Ready Rx dispensed Diclofenac Gel 3% and Meloxicam to this Insured pursuant to the prescription from David. On June 2, 2020 Ready Rx dispensed Diclofenac Gel 3% and Meloxicam to this Insured pursuant to a prescription from David issued on June 1, 2020. On July 7, 2020 Ready Rx dispensed Diclofenac Gel 3% and Meloxicam to this Insured pursuant to prescriptions from David ordered on July 6, 2020. On August 10, 2020 Ready Rx dispensed Diclofenac Gel 3% and Meloxicam to this Insured pursuant to prescriptions from David ordered on August 10, 2020. On January 18, 2021 Ready Rx dispensed Diclofenac Gel 3% and Meloxicam to this Insured pursuant to a prescription from David ordered on January 18, 2021.

Ready Rx billed GEICO at least $9,875.84 for pharmaceuticals allegedly prescribed and dispensed to this Insured.

vi.    Insured BK was allegedly involved in a motor vehicle accident on January 10, 2020. On January 15, 2020 he sought treatment with Crystal Ray Medical at the 63rd Drive Clinic and underwent an examination with Dr. Cohen who prescribed Celebrex, Lidoderm 5% Patches, and Cyclobenzaprine. The prescriptions for Celebrex and Cyclobenzaprine each allowed for three refills, and the prescription for Lidoderm 5% Patches allowed four refills. The prescription for Lidoderm 5% Patches instructed the EO to apply three patches per day, the maximum allowable daily dose, which increases EO's risk of overdose. On January 15, 2020 Ready Rx dispensed Cyclobenzaprine, Lidocaine 5% Patches, and Celecoxib to this Insured. On February 12, 2020 Ready Rx dispensed a refill of Cyclobenzaprine, Lidocaine 5% Patches, and Celecoxib. On March 13, 2020 Ready Rx dispensed a refill of Cyclobenzaprine, Lidocaine 5% Patches, and Celecoxib. On April 15, 2020 Ready Rx dispensed a refill of Cyclobenzaprine, Lidocaine 5% Patches, and Celecoxib. On May 13, 2020 Ready Rx dispensed a refill of Lidocaine 5% Patches. Thereafter, on June 17, 2020 Dr. Cohen issued prescriptions for Celebrex, Lidoderm 5% Patches, and Cyclobenzaprine. The prescriptions for Celebrex and Cyclobenzaprine allowed three refills and the prescription for Lidocaine 5% Patches allowed four refills. On June 17, 2020 Ready Rx dispensed Celecoxib, Lidocaine 5% Patches, and Cyclobenzaprine. On July 15, 2020 Ready Rx dispensed refills of Celecoxib, Lidocaine 5% Patches, and Cyclobenzaprine. On August 13, 2020 Ready Rx dispensed refills of Celecoxib, Lidocaine 5% Patches, and Cyclobenzaprine.

Ready Rx billed GEICO at least $8,387.40 for pharmaceuticals allegedly prescribed and dispensed to this Insured.

vii.    Insured LS was allegedly involved in a motor vehicle accident on June 22, 2020. On July 13, 2020 she sought treatment with the Cean Practice at the Remsen Avenue Clinic and underwent an examination with David who

prescribed Diclofenac Gel 3%. On July 14, 2020 Ready Rx dispensed Diclofenac Gel 3% to this Insured pursuant to the prescription from David ordered on July 13, 2020. On September 22, 2020 Ready Rx dispensed Diclofenac Gel 3% to this Insured pursuant to a prescription from David ordered on September 21, 2020. On October 28, 2020 Ready Rx dispensed Diclofenac Gel 3% to this Insured pursuant to a prescription from Dr. Cean ordered on October 26, 2020. On January 25, 2021 Ready Rx dispensed Diclofenac Gel 3% to this Insured pursuant to a prescription from David ordered on January 25, 2021. Notably, LS' past medical history includes high blood pressure which is a high-risk contraindication to LS' use of NSAID pain relievers like Diclofenac Gel 3%

Ready Rx billed GEICO at least $7,567.60 for pharmaceuticals allegedly prescribed and dispensed to this Insured.

viii.    Insured JC was allegedly involved in a motor vehicle accident on December 31, 2019. Thereafter she sought treatment with Danada Internal Medicine at the Northern Boulevard Clinic. On February 13 2020 she underwent a medical examination at which Dr. Rhee prescribed Lidothol Patches. On February 19, 2020 Ready Rx dispensed to JC Lidothol 4.5-5% Patches pursuant to a prescription from Dr. Rhee ordered on February 13, 2020. On March 4, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to the Insured pursuant to a prescription from Dr. Rhee ordered on February 27, 2020. On June 3, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches to the Insured pursuant to a prescription from Dr. Rhee ordered on June 2, 2020. On July 23, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches and Celecoxib to the Insured pursuant to prescriptions from Dr. Rhee ordered on July 6, 2020. On September 10, 2020 Ready Rd dispensed Celecoxib to the Insured pursuant to a prescription from Dr. Rhee ordered on September 2, 2020. On November 22, 2020 Ready Rx dispensed Lidothol 4.5-5% Patches and Celecoxib to the Insured pursuant to prescriptions from Dr. Rhee ordered on November 16, 2020.

Ready Rx billed GEICO at least $7,237.44 for pharmaceuticals allegedly prescribed and dispensed to this Insured.

ix.    Insured YP was allegedly involved in a motor vehicle accident on March 12, 2020. Thereafter she sought treatment with Crystal Ray Medical at the 63rd Drive Clinic. On March 16, 2020 she underwent a medical examination at which Dr. Cohen prescribed Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Butalbital-APAP-Caffeine. The prescriptions for Ibuprofen, Cyclobenzaprine, and Butalbital-APAP-Caffeine each allowed for three refills. The prescription for Lidocaine 5% Ointment allowed for four refills. On March 17, 2020 Ready Rx dispensed to YP Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Butalbital-APAP-Caffeine. On April 22, 2020 Ready Rx dispensed a Lidocaine 5% Ointment refill to the Insured. On April 24, 2020 Ready Rx dispensed a refill of Ibuprofen,

Cyclobenzaprine, and Butalbital-APAP-Caffeine to the Insured. On May 26, 2020 Ready Rx dispensed a refill of Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Butalbital-APAP-Caffeine to the Insured. On June 26, 2020 Ready Rx dispensed a refill of Lidocaine 5% Ointment, Ibuprofen, Cyclobenzaprine, and Butalbital-APAP-Caffeine to the Insured. On July 30, 2020 Ready Rx dispensed a refill of Lidocaine 5% Ointment to the Insured.

Ready Rx billed GEICO at least $7,031.40 for pharmaceuticals allegedly prescribed and dispensed to this Insured.

## IV.    The Fraudulent Billing the Defendants Submit or Cause to be Submitted to GEICO

158.    Every prescription product, whether a brand name or generic drug, has a designated national drug code ("NDC") – a unique 10-digit code that identifies the drug itself, the vendor of the drug and the quantity in which the drug was packaged.  Each NDC number has an assigned Average Wholesale Price ("AWP").

159.    Each NDC (and, thus, the AWP) for a particular prescription product differs depending on both the particular supplier the drug is purchased from and the quantity in which the drug is obtained.  The same drug can have a different NDC number if it is purchased from a different supplier and/or in different quantities.

160.    Pursuant to 12 N.Y.C.R.R. §§ 440.5(a) and (d) (the "Pharmacy Fee schedule"), for each brand name drug (or ingredient included in a compounded product) a provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 12% of the AWP, plus a single dispensing fee of $4.00.

161.    For each generic drug (or ingredient included in a compounded product) the provider may charge no more than the AWP assigned to that particular NDC on the day the drug was dispensed minus 20% of the AWP, plus a single dispensing fee of $5.00.

162.    The Defendants solicited the Clinic Controllers and the Prescribing Providers to provide them with voluminous prescriptions for the Fraudulent Topical Pain Products because the Defendants could readily buy the Fraudulent Topical Pain Products at low cost but bill GEICO and other New York No-Fault insurers inflated amounts based on egregiously high wholesale prices.

163.    The Defendants intentionally targeted the Fraudulent Topical Pain Products, with extremely expensive "average wholesale prices," in order to inflate Ready Rx's billing and maximize their profits.

164.    In support of their charges, the Defendants typically submitted: (i) the Prescribing Providers' prescription forms; (ii) a "No-Fault" form, known as an NF-3 Form, which included the purported NDC numbers, units, and corresponding charges for each drug product or ingredient; (iii) an itemized invoice which included the Insureds' demographics, dates the prescription was purportedly filled, the purported NDC numbers, units, and corresponding charges, and the name of the Prescribing Provider; and (iv) the executed AOB assigning the Insureds' benefits to the Defendants.

165.    The NDC numbers listed on the NF-3 Forms submitted by the Defendants are what identified the purported AWPs for each of the Fraudulent Pharmaceuticals.

166.    The Defendants never submitted to GEICO their wholesale purchase invoices demonstrating how much Ready Rx actually paid the supplier for the Fraudulent Topical Pain Products.

167.    The Defendants never submitted to GEICO any documents evidencing whether Ready Rx actually purchased topical pain products with the particular NDC number used in the billing, representing purchases from a particular supplier in a particular quantity.

168.     In fact, Ready Rx never actually paid the targeted and egregious "average wholesale price" of the Fraudulent Topical Pain Products that it dispensed, or purported to dispense, because it is not a true representation of actual market price and is far above the actual acquisition cost for Fraudulent Topical Pain Products.

169.     Ready Rx paid only a fraction of the "average wholesale price" of the Topical Diclofenac that the Defendants targeted to use in connection with Ready Rx's billing, but nevertheless billed GEICO and other No-Fault insurers egregious amounts far surpassing the cost of an array of other FDA approved, proven effective medications or commercially available over-the-counter products.

## V.     The Defendants' Submission of Fraudulent NF-3 Forms to GEICO

170.     To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits consistently have been submitted to GEICO by and on behalf of Ready Rx seeking payment for pharmaceuticals for which Ready Rx is ineligible to receive.

171.     These forms, including NF-3 forms, HCFA-1500 forms and other supporting records that the Defendants submit or cause to be submitted to GEICO, are false and misleading in the following material respects:

    i.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Fraudulent Pharmaceuticals were medically necessary and intended for genuine patient care. In fact, the Fraudulent Pharmaceuticals were the product of predetermined fraudulent protocols designed to exploit the patients for financial gain without regard for genuine patient care;

    ii.     The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants engaged in illegal, collusive relationships with the Prescribing Providers

and Clinic Controllers in order to steer voluminous and illegal prescriptions to Ready Rx for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives;

iii.   The NF-3 forms, HCFA-1500 forms, and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that they dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous, prescriptions; and

iv.   The NF-3 forms, HCFA-1500 forms and other supporting records uniformly misrepresented to GEICO that the Defendants were in compliance with all material licensing requirements and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Defendants did not comply with all material licensing requirements in that the Defendants intentionally targeted a specific set of pharmaceutical products that they could acquire at low cost and dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

## VI.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

172.   The Defendants are legally and ethically obligated to act honestly and with integrity in connection with the provision of pharmaceutical products to the Insureds and the billing they submit or cause to be submitted to GEICO seeking reimbursement for these products.

173.   To induce GEICO to promptly pay the charges for the Fraudulent Pharmaceuticals, the Defendants have gone to great lengths to systematically conceal their fraud.

174.   Specifically, the Defendants knowingly misrepresented and concealed facts in an effort to prevent discovery that (i) the Fraudulent Pharmaceuticals were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; and (ii) the Defendants were involved in collusive kickback arrangements with the Prescribing Providers and Clinic Controllers designed to generate

voluminous prescriptions solely to maximize the billing submitted to GEICO and other New York insurance companies.

175.    The Defendants also billed for the Fraudulent Pharmaceuticals based on purported prescriptions from multiple Prescribing Providers operating from multiple No-Fault Clinics in order to reduce the amount of billing based on any single licensee.

176.    The billing and supporting documentation submitted by the Defendants for the Fraudulent Pharmaceuticals, when viewed in isolation, did not reveal its fraudulent nature.

177.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.  In fact, Ready Rx continues to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that Ready Rx has been engaged in fraud.

178.    The Defendants' collection efforts through numerous separate no-fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single no-fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large scale-scale, complex fraud scheme involving the prescription and dispensing of fraudulent pharmaceuticals to patients across numerous different clinics.

179.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially-valid documents that were submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred

damages of approximately $273,700.00 representing payments made by GEICO based upon the fraudulent charges submitted by the Defendants.

180.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**THE FIRST CLAIM FOR RELIEF**
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

181.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

182.    There is an actual case in controversy between GEICO and the Defendants regarding approximately $970,000.00 in fraudulent billing for the Fraudulent Pharmaceuticals that the Defendants submitted or caused to be submitted to GEICO through Ready Rx.

183.    Ready Rx has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Pharmaceuticals were not medically necessary, not intended for genuine patient care, and were the product of predetermined fraudulent protocols designed solely to exploit the patients for financial gain.

184.    Ready Rx has no right to receive payment for any pending bills submitted to GEICO because the Defendants engaged in illegal, collusive relationships with the Prescribing Providers and Clinic Controllers in order to steer voluminous and illegal prescriptions to Ready Rx for the Fraudulent Pharmaceuticals, in exchange for the payment of kickbacks and other financial incentives.

185.    Ready Rx has no right to receive payment for any pending bills submitted to GEICO because the Defendants intentionally targeted a specific set of pharmaceutical products

(i.e., the Fraudulent Topical Pain Products) that they acquired at low cost and had Ready Rx dispense in large volumes to Insureds at egregious charges, in place of other effective, less costly pharmaceuticals.

186.    Ready Rx has no right to receive payment for any pending bills submitted to GEICO because the Defendants dispensed the Fraudulent Pharmaceuticals pursuant to illegal, invalid, and duplicitous, prescriptions.

187.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Ready Rx has no right to receive payment for any pending bills submitted to GEICO.

### THE SECOND CLAIM FOR RELIEF
**Against Aronov and Pinkhasov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

188.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

189.    Ready Rx is an ongoing "enterprise", as that term is defined in 18 U.S.C § 1961(4), that engages in activities which affect interstate commerce.

190.    Aronov and Pinkhasov knowingly have conducted and/or participated, directly or indirectly, in the conduct of Ready Rx's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of United States mail to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over nineteen months, seeking payments that Ready Rx was not eligible to receive under the No-Fault Laws because: (i) the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct medically unnecessary prescriptions for the Fraudulent Pharmaceuticals to Ready Rx in exchange for unlawful kickbacks and other financial incentives; (ii) the billed-for pharmaceutical

products were prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iii) the billed-for services were the product of illegal, invalid, and duplicitous prescriptions; and (iv) the Defendants intentionally targeted a specific set of pharmaceutical products that they acquired at low cost and had Ready Rx dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals.

191.    The fraudulent bills and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

192.    Ready Rx's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Aronov and Pinkhasov operated Ready Rx, inasmuch as Ready Rx was never eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Ready Rx to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Ready Rx to the present day.

193.    Ready Rx is inherently unlawful inasmuch as its very existence is an unlawful act, considering that it was created to exploit the New York "No-Fault" insurance system; engage in illegal, collusive arrangements involving prescriptions for the Fraudulent Pharmaceuticals; and bill pursuant to predetermined fraudulent protocols solely to financially enrich the Defendants. These inherently unlawful acts are taken by Ready Rx in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

194.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid greater than $339,000.00 pursuant to the fraudulent bills submitted by the Defendants.

195.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fee pursuant to 18 U.S.C. § 1961(4), and any other relief the Court deems just and proper.

## THE THIRD CLAIM FOR RELIEF
**Against All Defendants**
**(Common Law Fraud)**

196.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

197.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Pharmaceuticals under the name of Ready Rx.

198.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Ready Rx was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants participated in illegal, collusive relationships in which the Defendants steered the Prescribing Providers and Clinic Controllers to direct illegal prescriptions for the Fraudulent Pharmaceuticals to Ready Rx in exchange for unlawful kickbacks or other financial incentives; (ii) in every claim, the representation that the billed-for services were medically necessary and properly billed when in fact the billed-for services were not medically necessary and/or were the product of

predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iii) in every claim, the representation that Ready Rx was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the Defendants intentionally targeted a specific set of pharmaceutical products that they could dispense in large volumes to Insureds with exorbitant charges, in place of other effective, less costly pharmaceuticals solely for financial gain, in violation of law of New York State regulatory and licensing requirements; and (iv) in every claim, the representation that Ready Rx was acting in accordance with material licensing requirements and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact the billed-for services were the product of illegal, invalid, and duplicitous prescriptions, rendering the pharmacy ineligible reimbursement for No-Fault benefits.

199.   The Defendants intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Ready Rx that were not compensable under the No-Fault Laws.

200.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid greater than $339,000.00 pursuant to the fraudulent bills submitted, or caused to be submitted, by the Defendants through Ready Rx.

201.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

202.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THE FOURTH CLAIM FOR RELIEF
**Against All Defendants**
**(Unjust Enrichment)**

203.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

204.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

205.    When GEICO paid the bills and charges submitted by or on behalf of Ready Rx for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

206.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted and profited from, as a result of, among other things, the payments received and the receipt of kickback payments, notwithstanding their improper, unlawful, and unjust fraudulent billing scheme.

207.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

208.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in in an amount no less than $339,000.00.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a judgment be entered in their favor and against the Defendants, as follows:

A.   On the First Claim for Relief against the Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to

receive payment for any pending bills, amounting to approximately $970,000.00 submitted to GEICO;

B. On the Second Claim For Relief against Aronov and Pinkhasov, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $339,000.00 together with treble damages, punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

C. On the Third Claim For Relief against Aronov and Pinkhasov compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $339,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

D. On the Fourth Claim For Relief against all the Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but approximately $339,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated: Uniondale, New York
      August 24, 2021

RIVKIN RADLER LLP

By:   */s/ Michael A. Sirignano*
      Michael A. Sirignano
      Barry I. Levy
      Priscilla D. Kam
      Joanna Rosenblatt
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company GEICO General Insurance Company and GEICO Casualty Company*